# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>Debtor. | Chapter 7<br><br>BK Case No. 22-10066-CTG |
| DEBORAH EVANS MOTT, STEVEN M. ACOSTA, CHRISTOPHER MOTT, and JOHN S. MACIOROWSKI,<br><br>Appellants,<br><br>v.<br><br>GEORGE L. MILLER, solely in his capacity as the Chapter 7 Trustee of the estate of Team Systems International, LLC,<br><br>Appellee. | C.A. No. 1:26-cv-00213-GBW |

**APPENDIX REGARDING ANSWERING BRIEF OF APPELLEE, GEORGE L. MILLER, CHAPTER 7 TRUSTEE OF TEAM SYSTEMS INTERNATIONAL, LLC (A001 – A189)**

David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 N. Market Street, Suite 5400
Wilmington, Delaware 19801
(302) 295-0191
(302) 295-0199 (fax)
carickhoff@chipmanbrown.com
hall@chipmanbrown.com

Adam D. Cole (*pro hac vice* pending)
Chipman Brown Cicero & Cole, LLP
420 Lexington Avenue, Suite 442
New York, New York 10170
(646) 685-8363
cole@chipmanbrown.com

# TABLE OF CONTENTS

A001 – A013    Memorandum Opinion [D.I. 712]

A014    Order Denying Motion to Compel Abandonment [D.I. 713]

A015-A035    Motion of the Owners of Debtor to Compel Abandonment of Property of the Estate [D.I. 643]

A036-A045    Chapter 7 Trustee's Objection to Motion of the Owners of Debtor to Compel Abandonment of Property of the Estate [D.I. 645]

A046-A054    Chapter 7 Trustee's Letter Motion to Prohibit the TSI Members from Offering Evidence Based upon their Failure to Comply with Discovery Regarding their Abandonment Motion [D.I. 666]

A055-A057    Order with Respect to Trustee's Motion to Hold Debtor in Contempt [D.I. 222]

A058-A061    Order Compelling Certain Defendants to Comply with Discovery [Adv. D.I. 302]

A062-A138    Transcript of Hearing Held on January 23, 2026 Before the Honorable Craig T. Goldblatt, United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>　　　Debtor. | Chapter 7<br><br>Case No. 22-10066 (CTG)<br><br>**Related Docket No. 643** |

## <u>MEMORANDUM OPINION</u>

One of the subplots in this highly contentious and long-running bankruptcy case has been the status of two alleged receivables that the owners of the debtor claim are due to the estate from FEMA.[1]  The former owners (who are the movants in this contested matter) have said from the beginning that there are millions of dollars in value available to the estate if the trustee would only endeavor to collect it.  The trustee in this case has argued that he would be happy to recover any value that might be available to the estate and argues that the movants have failed to cooperate with his efforts to help collect these alleged receivables.

The movants have now moved to compel the trustee to abandon the alleged receivables, which would have the effect of returning those receivables to the prepetition debtor, and therefore make them available to the movants, as the holders of the debtor's equity.

The Court is dubious that there is any value here to be had.  But that is beside the point.  The trustee's fundamental position is that whatever value may be there

---

[1] The Federal Emergency Management Agency is referred to as "FEMA."

A001

belongs to the estate. And the one thing that the trustee is unwilling to do is to reward the movants for their failure to cooperate by abandoning the receivables, only to have the movants go out and collect for their own benefit on claims that are owned by the bankruptcy estate.

In a rational world, if the trustee requires the cooperation of the movants in order to chase the receivables, and that cooperation cannot be obtained by compelling the debtor to meet its obligations under § 521 or through other compulsory process, the parties would negotiate some mutually acceptable arrangement for obtaining that cooperation (such as a sale of the receivables or the sharing of any recoveries). The parties have represented to the Court that they have tried but failed to reach such an arrangement. That is what it is. This Court makes no finding about what has transpired. For the purposes of this motion, the trustee is within his rights to conclude that to the extent the movants have failed to cooperate with his efforts to collect on these alleged receivables, they should not obtain the right to collect on an estate asset for their personal benefit. That is a reasonable exercise of the trustee's judgment. The motion to compel is therefore denied.

## Factual and Procedural Background

The movants in this case were the owners of the debtor, a government contractor. The Court will not reprise the long and contentious history of these proceedings, which it has addressed in a number of earlier opinions.[2] For current

---

[2] *See, e.g., In re Team Systems International*, 640 B.R. 296 (Bankr. D. Del. 2022) (ruling on motion to dismiss or convert); *In re Team Systems International*, No. 22-10066, 2022 WL 2792006 (Bankr. D. Del. July 15, 2022) (decision on contested election of chapter 7 trustee);

2

purposes, all that matters is that the movants are the former owners of the debtor. They assert that the estate has valuable causes of action against FEMA for work that the debtor performed before the petition date.

These causes of action were relevant to the Court's consideration of a motion to dismiss or convert that it addressed almost four years ago. The Court's explanation of the dispute over these alleged receivables, from this early stage of the case, remains instructive.

"When the debtor filed the petition, a central theme was that it was owed millions of dollars from FEMA, and a short breathing spell from its creditors' collection activity would permit it to collect on this receivable, pay its creditors in full, and resume running its government contract business in the manner it had operated for more than 20 years."[3] The Court quoted Deborah Mott, one of the movants and the first-day declarant, as saying that "FEMA owes two payments to TSI."[4] The first was "for $13.5 million for nonpayment of TSI's invoice for FEMA's reduction in the initial ordered quantity of bottled water," which was then "pending before the U.S. Civilian Board of Contract Appeals."[5] At the time, the parties had filed cross motions for summary judgment and were awaiting the Board of Contract Appeals' decision.

---

*In re Team Systems International*, No. 22-10066, 2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) (decision granting pre-judgment asset freeze in adversary proceeding).

[3] *Team Systems*, 640 B.R. at 316-317 (internal citation omitted).

[4] *Id.* at 317 (citation omitted).

[5] *Id.*

3

The second payment at issue was described as a "change order claim" for approximately $6.8 million that the debtor intended to file as a result of the reduction of FEMA's order.  The Court again quoted the first-day declaration as saying that the breathing spell created by the bankruptcy "will allow for the collection of proceeds from the FEMA claims on each of these claims, providing TSI the funds to resolve the Judgment, if necessary, and emerge from this chapter 11 case as a healthier enterprise, continuing to serve the United States as a reliable contractor to important government agencies."[6]

The court noted that if "either (or both) of these multimillion-dollar payments appeared likely to be received in the short term, that would counsel in favor of giving the debtor a reasonable opportunity to take advantage of the breathing spell provided by the Bankruptcy Code in order to see if it might be in a position to pay its creditors in full and continue its business."[7]  But without purporting "to make findings with respect to either of these claims," the Court noted that based "on the evidence that was submitted, neither claim appears likely, at least in the short term, to generate a substantial recovery that will permit the debtor to confirm a plan that pays its creditors in full."[8]

With respect to the $13.5 million claim, the Court noted that the Civilian Board of Contract Appeals had (between the filing of the bankruptcy case and the hearing

---

[6] *Id.* (citation omitted).

[7] *Id.*

[8] *Id.*

4

on the motion to dismiss or convert) denied the parties' cross-motions for summary judgment. "The Board's decision holds that the mere decrease in the order is insufficient to entitle it to a restocking fee under the contract. Rather, TSI is required to prove that it actually incurred costs for restocking the water. And while, to repeat, this Court does not purport to make any sort of finding with respect to this issue, TSI did not present any evidence at the hearing before this Court suggesting that it actually incurred such a cost."[9]

The Court then addressed the change-order claim, noting that this claim "fares even worse."[10] The Court noted that in a declaration filed just before the hearing, one of the movants, Steven Acosta, said that "TSI imminently intends to submit a change order claim of $6.8 million on account of a FEMA change order which reduced the overall value of TSI's 2017 bottled water contract … from $117,566,730.00 to $25,636,352.37."[11] The Court then noted that at the hearing, "Acosta testified that TSI would be submitting this claim for the change order 'I believe, this week.'"[12] But on cross examination the following week, Acosta admitted that the order had not been submitted, but that "[w]e believe that's going in this week."[13] Thereafter, however, counsel for the debtor (who later withdrew from the representation) wrote to the Court on March 24, 2022 to correct that statement, noting that "the debtor's

---

[9] *Team Systems*, 640 B.R. at 317-318.

[10] *Id.* at 318.

[11] *Id.* (internal citations and quotation omitted).

[12] *Id.* (internal citations omitted).

[13] *Id.* (internal citations omitted).

government contracting lawyers had not been retained as ordinary course professionals and therefore have not engaged in post-petition work relating to this $6.8 million claim," but that the debtor "remain[s] hopeful that it will be prepared and submitted in the near term."[14]

As the Court noted back in 2022, it "bears emphasis, however, that this claim arises out of events that took place in 2017 and 2018. And as of the end of March 2022, TSI, which has suffered a $6.3 million judgment for which it was unable to post a bond, still has not asserted a claim for $6.8 million owed to it dating back more than four years. None of that makes much sense."[15] The Court thus found that it "cannot and will not conclude that it is sufficiently likely that TSI will recover on the $6.8 million claim that this potential recovery provides a basis for the debtor to remain a debtor in possession."[16] The Court accordingly converted the case to chapter 7.

In the intervening four years, what we know is that the cancellation claim has been fully litigated. After having been rejected by FEMA, the Civilian Board of Contract Appeals affirmed the denial of the claim on February 9, 2023.[17] The trustee then (retaining the same counsel that represented the debtor prepetition) appealed that denial to the Federal Circuit. That court heard oral argument on July 11, 2024

---

[14] *Id.* (citations omitted).

[15] *Team Systems*, 640 B.R. at 318.

[16] *Id.*

[17] *Team Systems International, LLC v. Department of Homeland Security*, Civilian Bd. Contract Appeals 7145 (Feb. 9, 2023) (decision available at: www.cbca.gov/files/decisions/2023/SHERIDAN_02-09-23_7145__TEAM_SYSTEMS_INTERNATIONAL_LLC%20(DECISION).pdf).

A006

and four days later issued a one-line decision affirming the Civilian Board of Contact appeals.[18]  That decision is therefore now final and non-appealable.

The change-order claim remains the subject of dispute.  The trustee has taken the position that he would happily pursue the claim if the movants would provide him sufficient information to permit him to assert it.  The movants argue that the trustee has all of the information he needs and fault the trustee for failing to act.[19]  Against this backdrop, the movants filed the present motion seeking to compel the trustee to abandon these claims under § 554(b) of the Bankruptcy Code.

### Jurisdiction

The Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) as a case "arising under" § 554(b) of the Bankruptcy Code.  This proceeding is a core matter on which the Court may enter final judgment under 28 U.S.C. § 157(b).  It has been referred to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.

### Analysis

In addition to the provision of § 554(a) of the Bankruptcy Code that authorizes a trustee to abandon property that is "burdensome to the estate" or of "inconsequential value," § 554(b) provides that on "request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property

---

[18] *Team Systems International, LLC v. Secretary of the Department of Homeland Security*, Fed. Cir. No. 2023-1556 (July 15, 2024).

[19] *See e.g.*, D.I. 645 at 6-7 (describing the back and forth between the trustee and the movants regarding the change order claim).

of the estate" that is either burdensome or of inconsequential value.[20]  The statute, however, does not by its terms identify the standard to be applied when a party in interest seeks to compel the abandonment of property over a trustee's objection.  A leading treatise observes that "the party requesting abandonment has the burden of proof," but provides little further guidance about how to resolve a dispute like the one presented here, where the value of the asset is quite uncertain, and the trustee's principal concern is simply in ensuring that whatever value the asset may or not may have is realized by the estate rather than the debtor's prior equity holder.[21]

It bears note, however, that the abandonment power traces its roots to pre-Code practice.[22]  To that end, the Supreme Court noted in 1878 that it was already a "long recognized principle" of bankruptcy that "the assignees of a bankrupt are not, in certain cases, bound to take property of an onerous or unprofitable character,

---

[20] 11 U.S.C. § 554(b).  As this Court recently noted, "[a]bandoned property leaves the bankruptcy estate and typically becomes property of the prepetition debtor." *In re Oldco Tire Distributors*, No. 24-12391, 2025 WL 3130700, at *4 n. 27 (Bankr. D. Del. Nov. 7, 2025).  In this sense, abandonment is "analogous to the rejection of an executory contract," which also operates to remove the asset (there, a contract) from the bankruptcy estate.  *Id.*

[21] *See generally* 5 *Collier on Bankruptcy* ¶ 554.02[4] (16th ed. 2025).

[22] *See e.g., Sparhawk v. Yerkes*, 142 U.S. 1, 13 (1891) ("[The assignee is] not bound … to accept property of an onerous and unprofitable nature, which would burden instead of benefiting the estate, and they [can] elect whether they would accept or not, after due consideration and within a reasonable time."); *Smith v. Gordon*, 22 F. Cas. 554, 556 (D. Me. 1843) ("By the bankrupt act, all the property and rights of property of the bankrupt, by force of the decree of bankruptcy, pass to the assignee by operation of law, and become vested in him as soon as it is appointed.  But though the legal title passes, he is not bound to take possession of all.  It is perfectly well settled with respect to leasehold estates, under the English bankrupt laws, that the assignee is not bound to take the lease, and charge the estate with the payment of rent." (citing *Copeland v. Stephens*, 106 Eng. Rep. 218 (K.B. 1818))).

which would burden instead of benefiting the estate; and there are numerous decisions, English and American, which support the proposition."[23]

The pre-Code practice, consistent with modern bankruptcy law, was that the power in the first instance to decide which assets to administer and which to abandon was to be made by the trustee, in the exercise of the trustee's discretion.[24] When a party in interest challenges the trustee's decision, courts have historically deferred to the trustee's judgment, requiring a finding only that the trustee made "1) a business judgment; 2) in good faith; 3) upon some reasonable basis; and 4) within the trustee's scope of authority."[25]

It was also true, however, that under pre-Code practice parties could file motions with the Court seeking to compel abandonment over the trustee's objection. Indeed, the Supreme Court observed in *Glenny* that "if the assignee should erroneously or unwisely" exercise its discretion, "creditors may, by petition, apply to the court … to compel him to carry out their wishes."[26] For this reason, courts have observed that "abandonment is in the discretion of the trustee, bounded only by that of the court."[27]

---

[23] *Glenny v. Langdon*, 98 U.S. 20, 31 (1878).

[24] *See First National Bank v. Lasater,* 196 U.S. 115, 118-19 (1905) (determining that the trustee is "not bound to accept property of an onerous or unprofitable character" and may "decline to take the property"); *In re K.C. Machine & Tool Co.,* 816 F.2d 238, 246 (6th Cir. 1987) ("[I]n its discretion, the trustee may abandon property to the debtor where administration thereof would not benefit the estate-the creditors."); *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) ("The trustee's power to abandon property is discretionary.").

[25] *Slack*, 290 B.R. at 284 (citations omitted).

[26] *Glenny*, 98 U.S. at 31.

[27] *In re Interpictures, Inc.*, 168 B.R. 526, 535 (Bankr. E.D.N.Y. 1994).

9

A009

The pre-Code caselaw suggests that the power to compel a trustee to abandon property stemmed from the concern that trustees would choose to sell property in circumstances in which there would be little to no return to the bankruptcy estate, but where the trustee might nevertheless obtain fees or a commission in connection with a sale. For example, in *Seaboard National Bank v. Rogers Milk Products*, the court emphasized that it could "conceive of no benefit which the estate … could obtain … in so selling [the property], except to get fees for themselves and their attorneys."[28] The court noted that such an outcome is "shocking" and brings the system into "disrepute in the popular mind."[29] The court "condemn[ed] in no uncertain terms the practice."[30]

Congress codified this body of caselaw by enacting § 554(b) of the Bankruptcy Code.[31] Caselaw construing this provision accordingly recognizes that abandonment should be compelled in those cases where it would "help the creditors by assuring some benefit in the administration of each asset."[32] But such an outcome – a court

---

[28] 21 F.2d 414, 417 (7th Cir. 1927).

[29] *Id.*

[30] *Id. See also See K.C. Mach. & Tool*, 816 F.2d at 246 ("In enacting § 554, Congress was aware of the claim that formerly some trustees took burdensome or valueless property into the estate and sold it in order to increase their commissions. Some of the early cases condemned this particular practice in no uncertain terms, and decried the practice of selling burdensome or valueless property simply to obtain a fund for their own administrative expenses.") (citations omitted).

[31] *In re Interpictures, Inc.*, 168 B.R. at 535.

[32] *Id.* (citation omitted).

compelling abandonment – has always been recognized as "the exception, not the rule."[33]

Consistent with this history, the caselaw construing § 554(b) has generally concluded that in the absence of (a) reason to be concerned that the trustee is engaged in self-dealing; or (b) a cost to the estate of retaining ownership of the asset, courts should typically respect a trustee's decision to continue to administer an asset rather than abandon it. *In re Janmar*, for example, surveyed cases and noted that there is no duty to abandon unless "administration of the asset would cause expense to the estate."[34] Similarly, *Interpictures* recognized that, even where "the assets have been shown to be valueless and of no burden to the estate, there is always the possibility that someone may make a payment on the receivables in the future."[35] And in such a case, where holding the asset imposes no burden, but the potential for a future receivable remains (even if it may be remote), the trustee may retain an asset so that the proceeds (were they to be realized) would be distributed to creditors.[36]

The movants here assert that the trustee's "ongoing refusal to administer or abandon [the FEMA] claims in this active case delays administration, risks permanent loss of value, and incurs unnecessary costs, violating his fiduciary duties

---

[33] *Id.*

[34] *Janmar*, 4 B.R. at 10 ("Cases describing a 'duty to abandon' have invariably been decided in situations in which the evidence clearly showed that the lien exceeded the value of the collateral and administration of the asset would cause expense to the estate." (citations omitted)).

[35] *Id.*

[36] *Id.*

under 11 U.S.C. § 704(a)(1) to collect and liquidate estate property and close the estate expeditiously."[37]  The movants further argue that the FEMA claims must be abandoned to "preserve remaining estate value and prevent further harm to creditors and the estate."[38]

The Court is unpersuaded by this argument.  Nothing in the record suggests that the administration of the assets in question here imposes any expense on the bankruptcy estate.  Nor is there any suggestion that the failure to abandon these assets has harmed creditors.  At the end of the day, this dispute is simply the result of a standoff between the trustee and the movants.  The trustee has doubts (as does the Court) that there is value in these claims.  The $13.5 million claim for the reduction in FEMA's order has ended in a judgment against the estate that is now final and non-appealable.  When the movants had corporate law authority to manage the debtor, they let years go by without taking any action on the change-order claim that they contend will bring in $6.8 million.

Applying the test set out in the cases described above, there is no basis for finding that the trustee has engaged in self-dealing with respect to these claims or that the bankruptcy estate is bearing expenses associated with administering them that could be avoided through abandonment.  What is going on here is that the trustee is distrustful of the movants, whom he believes (rightly or wrongly) have failed to cooperate with his efforts to maximize value for the benefit of the estate.  And he is

---

[37] D.I. 643 at 2.

[38] *Id.* at 18.

worried, not without some reason, that he would be viewed as having fallen down on his job if he were to abandon the estate's interest in these claims, only to have the movants pull a rabbit out of a hat and find a way to obtain value in them for themselves.

The obvious solution, in circumstances such as these, would be for the parties to reach a mutually acceptable arrangement.  Perhaps there is a price at which the movants would acquire the estate's rights from the trustee.  Perhaps there is some arrangement that the parties might reach under which the movants would pursue the claims and the proceeds would be shared between the movants and the bankruptcy estate.  All of that is up to the parties.  Under the circumstances presented here, however, the Court is satisfied that it ought not permit the movants to conduct an end run around the trustee and the bankruptcy estate and obtain the assets for themselves by means of compelled abandonment under § 554(b).  For the reasons described above, that tool was intended to solve a different kind of problem, and provides no reason to override the trustee's judgment on the record before this Court.

### Conclusion

For the reasons set forth above, the motion to compel abandonment will be denied.  The Court will issue an appropriate order so providing.

Dated: February 18, 2026

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

13

A013

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| | **Related Docket No. 643** |
| Debtor. | |

### ORDER DENYING MOTION TO COMPEL ABANDONMENT

This matter, having come before the Court on the motion of the owners of debtor to compel abandonment of property of the estate (the "Motion"), and

Upon consideration of the parties' submissions and for the reasons stated in the Court's Memorandum Opinion [D.I. 712],

IT IS HEREBY ORDERED that the Motion is DENIED.

Dated: February 18, 2026

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

A014

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | **Hearing Date: August 20, 2025 at 9:30 a.m.**<br>**Objection Deadline: July 30, 2025 at 4:00 p.m.** |

**MOTION OF THE OWNERS OF DEBTOR TO COMPEL ABANDONMENT OF
<u>PROPERTY OF THE ESTATE</u>**

Deborah Evans Mott, Steven M. Acosta, Christopher Mott, and John S. Maciorowski (collectively, the "Movants"), the 100% owners of Team Systems International, LLC (the "Debtor"), by and through their undersigned counsel, hereby move (the "Motion") pursuant to section 554(b) of title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. § 554(b), and Rule 6007(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to compel George L. Miller, in his capacity as Chapter 7 Trustee (the "Trustee") of the Debtor's estate, to abandon certain claims against the Federal Emergency Management Agency ("FEMA"). In support of this Motion, the Movants respectfully state as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. In this active Chapter 7 case, valuable estate assets are trapped in limbo, including claims against the Federal Emergency Management Agency ("FEMA") arising from its $13.5 million reduction in volume of bottled water ("Cancellation Claim"), and arising from the $5.7 million change in transportation of water ("Change Order Claim"), totaling over $19 million (collectively, the "FEMA Claims"). Neither are pursued by the Trustee nor released to the Movants, who are willing to pursue them at their own expense. The Cancellation Claim, arising from FEMA's reduction of a bottled water order during Hurricane Maria, has been denied by multiple tribunals. The Change Order Claim, stemming from FEMA's unilateral modification of

A015

shipping requirements, remains dormant despite extensive documentation of its merit. The Trustee's ongoing refusal to administer or abandon these claims in this active case delays administration, risks permanent loss of value, and incurs unnecessary costs, violating his fiduciary duties under 11 U.S.C. § 704(a)(1) to collect and liquidate estate property and close the estate expeditiously, as well as the *Handbook for Chapter 7 Trustees*, Chapter 4.C. *See* U.S. Dep't of Justice, *Handbook for Chapter 7 Trustees* (Oct. 1, 2012) ("Trustee Handbook") *at* ch. 4.C at 4-2.

2.    The Trustee has further failed to collect several accounts receivable. The Trustee's abandonment of $128,747.89 in readily collectible Defense Logistics Agency ("DLA") Energy reimbursements mirrors his refusal to pursue or abandon the $19 million FEMA Claims, demonstrating a pattern of fiduciary breaches that justifies compelling abandonment under 11 U.S.C. § 554(b). *See* 11 U.S.C. §§ 704(a)(1), (2), (4), (7), (9); *but see* Ex. 1 (DLA's May 14, 2024, production confirming abandonment of its reimbursements). This mismanagement delays administration, risks asset value loss, and burdens the estate in this active Chapter 7 case, contrary to the *Handbook for Chapter 7 Trustees*. *See* Trustee Handbook at ch. 4.C at 4-2; *id.* at 6.B at 6-2. The Trustee closed the account that automatically would have received these payments, demonstrating this lack of understanding of how federal contract payments are processed.

3.    DLA's May 14, 2024, letter to Bryan J. Hall, Esq., attached hereto as Ex. 1, confirms production of Team Systems International, LLC's invoices contractually owed to the estate for services rendered (*see generally* Ex 1-4):[1]

---

[1] The DLA's redactions, as explained in its May 14, 2024, letter, *see* Ex. 1, were made pursuant to 32 C.F.R. § 97.8 due to the Trustee's lack of security clearance, as required by the Department of Defense for access to certain controlled unclassified information. Team Systems International,

    a.      October 20, 2021: $29,287.98 (Invoice 54878)

    b.      November 8, 2021: $22,931.01 (Invoice 55229)

    c.      December 7, 2021: $48,444.90 (Invoices 55341 and 55398)

    d.      December 12, 2021: $28,084.00 (Invoice 55369)

4.      These invoices, marked "CONTRACT ITEMS ARE TO BE REIMBURSED BY DLA ENERGY/DFAS," represent collectible estate assets, as verified by the DLA's response, with redactions limited to non-responsive or sensitive information unrelated to the invoices' validity. *See* Ex. 1. Yet, the Trustee closed the Artisans Bank account (balance: $175,749.23, P0002197) by January 31, 2022, before collecting these funds, effectively abandoning them without court approval or notice. This violates his duty to "collect and reduce to money the property of the estate" under 11 U.S.C. § 704(a)(1), to ensure proper management of estate funds under 11 U.S.C. § 345, and to faithfully perform duties as conditioned by the bond under 11 U.S.C. § 322(a). *See* Trustee Handbook at ch. 2.L at 2-9; *see also id.,* at ch. 4.C.3.e at 4-5, ch. 5.E.4 at 5-9. The Trustee's failure to notify the United States Trustee of this abandonment, as required by 28 U.S.C. § 586, further breaches his duty to report incidents that may trigger bond claims or asset losses. Trustee Handbook at ch. 5.G.5.e at 5-22.

5.      The Trustee's approach has shifted from passive disinterest to harm to the detriment of Movant's legitimate financial interests. Despite receiving comprehensive documentation and offers of assistance from the Movants, who possess over fifty years of

---

LLC held a facility security clearance, and its personnel had personal clearances, enabling access to such information. The redactions do not affect the validity of the $128,747.89 in invoices, which remain contractually owed. *See* Ex. 1. The Trustee's failure to obtain clearance or coordinate with cleared TSI personnel or the United States Trustee to collect these funds violates his duty to investigate and collect estate assets under 11 U.S.C. § 704(a)(1) and (a)(4). *See* Trustee Handbook at ch. 4.C at 4-2; *id.* at ch. 4.E at 4-27.

collective expertise in government contracting, the Trustee refused to pursue the Change Order

Claim before its critical October 6, 2023 deadline, preventing others from preserving it. This

inaction breaches his duty under 11 U.S.C. § 704(a)(1) to collect and reduce estate property to

money and under 11 U.S.C. § 704(a)(2) to be accountable for all property received. *See also*

Trustee Handbook at ch. 4.C.3.e at 4-5 (requiring Trustees to pursue or abandon burdensome

assets).

6.      Most troublingly, in this active Chapter 7 case, the Trustee relies on the denial of

the Cancellation Claim to argue in other proceedings that the Debtor's estate is administratively

insolvent, yet he simultaneously refuses to abandon either claim. He further has taken no

ongoing action to collect either claim. This creates a catch-22: the claims are deemed worthless

for estate valuation but worth retaining to block the Movants' pursuit, prolonging the case and

increasing administrative costs (e.g., bond premiums, legal fees). The Trustee Handbook requires

Trustees to avoid dilatory administration, *id.* at ch. 6.D at 6-4, and 11 U.S.C. § 704(a)(1)

mandates expeditious closure, making this contradiction untenable.

7.      The timing of this Motion is critical in this ongoing case. The Trustee's July 16,

2024, filing in the U.S. District Court asserts insolvency based on the Cancellation Claim's

denial. *See* D.I. 528; *see also* Ex. 2. Yet, he retains control over both claims, particularly the

unpursued $5.7 million Change Order Claim. This stance delays case closure, risks further loss

of value (e.g., due to statutes of limitations), and violates the Trustee's duty under 11 U.S.C. §

704(a)(1) to maximize creditor returns and under 11 U.S.C. § 704(a)(9) to file a final account.

*See also* Trustee Handbook at ch. 4.C at 4-2. By contrast, the Movants are prepared to pursue the

claims at no cost to the estate, aligning with the *Handbook*'s support for abandonment when third

parties can pursue assets. *Id.* at ch. 4.C.3.e at 4-5.

8.       Section 554(b) of the Bankruptcy Code, 11 U.S.C. § 554(b), was designed to address this situation. The FEMA Claims are burdensome to the estate, as evidenced by the Trustee's unwillingness to pursue them despite his alleged specialized counsel and the Movants' expertise. Retaining them in this active case serves only to obstruct potential recovery, contrary to the Trustee's duty under 11 U.S.C. § 704(a)(1) to preserve estate value and under 11 U.S.C. § 704(a)(7) to furnish information to parties in interest, as well as the Handbook. *See* Trustee Handbook at ch. 4.N at 4-36. The Court should compel abandonment to resolve this impasse, remove administrative burdens, and enable the Movants to pursue potential value for the benefit of all stakeholders.

## JURISDICTION, VENUE, AND STATUTORY BASIS

9.       This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

10.       Pursuant to Local Rule 9013-1(f), Movants do *not* consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

11.       Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

12.       This is a core proceeding under 28 U.S.C. § 157(b).

13.       This Motion is governed by section 554(b) of the Bankruptcy Code, 11 U.S.C. § 554(b), and Bankruptcy Rule 6007(b).

A019

**BACKGROUND**

**A.      The Chapter 11 Filing and Conversion to an Active Chapter 7 Case**

14.      On November 18, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, prompted by a garnishment on a contract with the Defense Logistics Agency to execute a judgment obtained by GPDEV, LLC and Simons Exploration, Inc. (the "Florida Creditors") in the United States District Court for the Northern District of Florida. *See generally GPDEV, LLC et al. v. Team Sys. Int'l, LLC*, 4:18-cv-00442-RH-MAF, ECF 343 (N.D. Fla. December 28, 2021) (executing the writ of garnishment as to DLA).

15.      Prior to the Petition Date, the Debtor built a successful business performing services under federal government contracts, including critical disaster relief efforts like providing emergency water supplies post-Hurricane Maria.

16.      At the time of filing, the Debtor had no secured debt and minimal unsecured debt beyond the Florida Creditors' judgment. Its two substantial FEMA Claims in addition to the pipeline of abandoned smaller receivables, if collected, could satisfy all creditors and allow distributions to equity holders.

17.      On March 31, 2022, this Court converted the case to Chapter 7, finding Chapter 11 rehabilitation infeasible. The United States Trustee appointed George L. Miller as the Chapter 7 Trustee to administer the Debtor's estate, which remains active. The Movants maintain that the Debtor has never been insolvent, as the FEMA Claims represent significant asset value. The Trustee's ongoing failure to pursue or abandon these claims in this active case delays administration, risks permanent loss of value (e.g., due to expired deadlines), and incurs costs, violating his duty under 11 U.S.C. § 704(a)(1) to collect and liquidate assets expeditiously, under

A020

11 U.S.C. § 704(a)(2) to be accountable for estate property, and under 11 U.S.C. § 704(a)(9) to file a final account, as well as the Handbook. *See* Trustee Handbook at ch. 4.N at 4-36.

18.     The Trustee inaccurately represented his experience in federal contracts and his security clearances. It is now clear that he was not qualified to make decisions or take necessary actions on matters involving federal contracts, which constituted the entirety of TSI's business.

**B.     The FEMA Claims**

19.     The FEMA Claims, the estate's most significant assets, arise from a disaster relief contract but stem from distinct government actions.

### i.     The Cancellation Claim

20.     The Cancellation Claim arose when FEMA reduced its emergency bottled water order during Hurricane Maria, triggering pre-negotiated liquidated damages of approximately $13.5 million.

21.     After FEMA refused payment, the Debtor pursued the claim through the Civilian Board of Contract Appeals, which denied it on February 9, 2023. The Trustee obtained Court approval to retain Venable LLP as special counsel to appeal.

22.     On July 15, 2024, the United States Court of Appeals for the Federal Circuit summarily affirmed the denial. *Team Sys. Int'l, LLC v. Sec'y of Dep't of Homeland Sec.*, No. 2023-1556, 2024 WL 3407429 (Fed. Cir. July 15, 2024). The Trustee has taken no further action to pursue alternative recovery approaches in this active case, breaching his duty under 11 U.S.C. § 704(a)(1) to collect and reduce estate property to money. *See also* Trustee Handbook at ch. 4.C at 4-2.

**ii.     The Change Order Claim**

23.     The Change Order Claim stems from FEMA's unilateral modification of the contract's shipping requirements from breakbulk to container shipping, causing $5.7 million in additional costs under Federal Acquisition Regulation ("FAR") 52.243-1.

24.     Over a year ago, Ms. Mott and Mr. Acosta provided the Trustee with comprehensive documentation, *see* Ex. 3, including:

> a.     Itemized subcontractor costs showing $5.7 million in container-specific expenses;
>
> b.     Supporting documentation differentiating these costs from other contract expenses totaling over $3.6 million;
>
> c.     Payment records confirming the Debtor's disbursement;
>
> d.     Bank records verifying payments;
>
> e.     Correspondence with FEMA about the shipping changes;
>
> f.     Internal accounting records tracking cost impact; and
>
> g.     Detailed cost calculations and explanations.

25.     Despite this documentation, the Trustee directed Venable not to discuss the Change Order Claim with the Movants, days before the October 6, 2023, deadline—the six-year anniversary of FEMA's contract modification.

26.     On October 6, 2023, the Trustee's counsel explicitly refused to act, stating: "We don't believe there is sufficient support to assert a $5.7m claim. The trustee will not be submitting a change order claim against FEMA today for $5.7m and will not authorize Ms. Mott to do so." Ex. 4. This refusal came despite the Movants' explanation that filing required only

ordinary business records and a good faith certification under FAR 33.207, risking the claim's loss in this active case.

27.     The Trustee's inaction demonstrates constructive abandonment, as he retains the claims without intent to administer them, blocking the Movants' pursuit. The *Trustee Handbook* requires Trustees to pursue assets or abandon those deemed burdensome. *See* Trustee Handbook at ch. 4.C.3.e at 4-5. Similarly, 11 U.S.C. § 704(a)(1) mandates liquidation or expeditious disposition of estate property. In an active case, this inaction delays administration and risks further value loss, warranting court intervention. *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003).

**C.      Current Status in the Active Chapter 7 Case**

28.     In this active Chapter 7 case, the Trustee's contradictory positions impede efficient administration. On July 16, 2024, in *Acosta et al v. Miller*, C.A. No. 1:23-cv-01038-GBW (D. Del. 2023), he filed a Notice of Supplemental Authority arguing that the Federal Circuit's denial of the Cancellation Claim renders the estate insolvent, challenging the Movants' standing as equity holders. *See* Ex. 2 (arguing Movants' lacked appellate standing because "this bankruptcy estate remains insolvent."). Yet, he retains both FEMA Claims, preventing the Movants from pursuing recovery at their own expense. This delays case closure, increases costs, and violates the Trustee's duty under 11 U.S.C. § 704(a)(1) to maximize creditor returns and close the estate expeditiously, under 11 U.S.C. § 704(a)(9) to file a final account, and under 11 U.S.C. § 704(a)(7) to provide information to parties in interest. *See also* Trustee Handbook at ch. 4.A at 4-1, 4.C.13 at 4-26, ch. H at 4-30.

29.     If the Trustee deems these claims worthless, as implied by his insolvency argument, abandoning them in this active case would cause no harm to the estate. Retaining

unpursued claims serves only to obstruct the Movants, who are willing to assume litigation risks. The Handbook supports abandonment when assets are burdensome or of inconsequential value, *id.* at ch. 4.C.3.e at 4-5, and 11 U.S.C. § 554(b) authorizes the court to compel such abandonment.

### RELIEF REQUESTED

30.     The Movants respectfully request that this Court enter an order compelling the Trustee to abandon the Cancellation Claim and the Change Order Claim pursuant to Section 554(b) of the Bankruptcy Code, 11 U.S.C. § 554(b). In this active Chapter 7 case, abandonment would:

    a.     Remove administrative burdens, such as bond premiums and legal fees;

    b.     Allow the Movants to pursue recovery at no cost to the estate;

    c.     Resolve the impasse preventing value realization, advancing case administration; and

    d.     Serve the best interests of stakeholders by enabling potential surplus value, consistent with the Trustee's duty under 11 U.S.C. § 704(a)(1) to maximize returns, as reinforced by the Trustee Handbook at ch. 4.C at 4-2.

### ARGUMENT

**A.      Legal Standard for Compelling Abandonment**

31.     Section 554(b) of the Bankruptcy Code provides that "on request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b). This prevents Trustees from hoarding unpursued assets while blocking others' recovery efforts. *In re Reich*, 54 B.R. 995, 1004 (Bankr. E.D. Mich. 1985).

The *Handbook for Chapter 7 Trustees* supports abandonment when litigation costs outweigh benefits. *See* Trustee Handbook at ch. 4.C.3.e at 4-5.

32.     Abandonment is appropriate when property is burdensome or of inconsequential value. *In re Viet Vu*, 245 B.R. 644, 647 (B.A.P. 9th Cir. 2000); *see also In re Ditech Holding Corp.*, 630 F. Supp. 3d 554, 558 (S.D.N.Y. 2022) (holding that 11 U.S.C. § 365 "enables the trustee or debtor in possession to maximize the value of the estate by availing itself of contracts that are profitable while abandoning those that are burdensome."). Property is burdensome when administration costs, such as litigation expenses, outweigh potential benefits. *In re K.C. Mach. & Tool Co.*, 816 F.2d 238, 246 (6th Cir. 1987). The Trustee has already made this decision with regard to all of the claims subject to this motion. In an active case, retaining unpursued claims incurs ongoing costs, making abandonment critical under 11 U.S.C. § 554(b). *See generally* Trustee Handbook at ch. 4.C.3 at 4-3.

**B.     The Trustee Has Constructively Abandoned These Claims in an Active Case**

33.     In this active Chapter 7 case, the Trustee's conduct warrants court intervention under 11 U.S.C. § 554(b). The *Handbook for Chapter 7 Trustees*, consistent with statute, requires Trustees to administer assets or abandon those deemed burdensome. *See* Trustee Handbook at ch. 4.C at 4-2; *see also id.* at 4.C.3.e at 4-5; *see also* 11 U.S.C. § 704(a)(1), (2). The Trustee has:

> a.     Allowed the Change Order Claim to expire by refusing to file or authorize others to file by October 6, 2023, despite documentation, *see* Ex. 4;
>
> b.     Argued in the District Court that the Cancellation Claim's denial renders the estate insolvent, yet retains both claims, blocking Movants' pursuit; and

A025

      c.      Refused to officially abandon the claims despite no intent to pursue them, delaying administration and risking value loss.

34.     This constitutes constructive abandonment, as the Trustee retains assets without administering them, violating his duty under 11 U.S.C. § 704(a)(1) to preserve estate value and under 11 U.S.C. § 704(a)(7) to engage with parties in interest, as well as the Handbook. *See* Trustee Handbook at ch. 4.N at 4-36. Courts compel abandonment when Trustees prevent recovery by others. *In re Stetson & Assocs.*, Inc., 330 B.R. 613, 624 (Bankr. E.D. Tenn. 2005). In an active case, this paradox—deeming claims worthless but retaining them—harms the estate by delaying closure and increasing costs, contrary to 11 U.S.C. § 704(a)(1) and § 704(a)(9).

35.     The Trustee's decision to halt further action to collect both FEMA Claims and to not collect the smaller accounts receivable from DLA has already been made by the Trustee. *Cf. In re Wilton Armetale, Inc.*, 618 B.R. 424 (Bankr. E.D. Pa. 2020) (approving abandonment order where Trustee determined to not pursue litigation or take further actions to collect claims).

**C.     Compelling Abandonment Serves the Best Interests of the Estate**

36.     Abandonment is appropriate in this active case to enable value realization and expedite administration. The Handbook supports abandonment when third parties can pursue claims at no cost to the estate. *See* Trustee Handbook at ch. 4.C.3.e at 4-5; *see also In re Cult Awareness Network, Inc.*, 205 B.R. 575, 579 (Bankr. N.D. Ill. 1997). 11 U.S.C. § 554(b) authorizes such relief. The Movants' expertise and willingness to bear costs establish their standing to seek abandonment. *In re Drost*, 228 B.R. 208, 210 (Bankr. N.D. Ind. 1998); *see also In re Wilton Armetale, Inc.*, 968 F.3d 273, 284 (3d Cir. 2020) ("An abandoned claim, like abandoned property in general, flows to someone else. The abandoned property can flow back 'to any party with a possessory interest in it.'") (citing 5 Collier on Bankruptcy ¶554.02[3](16th

ed. 2020)); *see also In re Dewsnup*, 908 F.2d 588, 590 (10th Cir. 1990) ("Following abandonment, whoever had the possessory right to the property at the filing of the bankruptcy again reacquires that right." (internal quotation marks omitted)).

37.     The Trustee's actions show the claims are burdensome. He deems the Cancellation Claim worthless post-denial and found the Change Order Claim's documentation insufficient, despite retaining counsel, violating 11 U.S.C. § 704(a)(1) and the Handbook. *See* Trustee Handbook at ch. 4.C.3 at 4-3. The Trustee simply abandoned the other accounts receivable by closing the bank account required for their payment.  Retaining these claims in an active case incurs costs without benefit, contrary to the Trustee's duty under 11 U.S.C. § 704(a)(1) to minimize expenses. *See also* Trustee Handbook at ch. 4.C at 4-2.

38.     The Trustee's inaction has caused harm, potentially losing the $5.7 million Change Order Claim. The *Handbook for Chapter 7 Trustees* requires preserving assets or abandoning them to avoid such losses, *id.* at ch. 4.N at 4-36, and 11 U.S.C. § 704(a)(1) mandates preservation of estate value. In an active case, this harm continues, necessitating abandonment under 11 U.S.C. § 554(b) to enable Movants' pursuit.

39.     The Trustee's duty to expedite administration in an active case pursuant to 11 U.S.C. § 704(a)(1) and (a)(9), supports abandonment to resolve the impasse and serve the estate's interests. *See* Trustee Handbook at ch. 6.B at 6-2.

**D.     The Trustee's Abandonment of the DLA's Reimbursements Evidences a Pattern of Mismanagement Supporting Compelled Abandonment of the FEMA Claims**

40.     The Trustee's abandonment of $128,747.89 in readily collectible Defense Logistics Agency ("DLA") Energy reimbursements mirrors his refusal to pursue or abandon the $19 million FEMA Claims, demonstrating a pattern of fiduciary breaches that justifies compelling abandonment under 11 U.S.C. § 554(b). *See* 11 U.S.C. §§ 704(a)(1), (2), (4), (7), (9);

*but see* Ex. 1 (DLA's May 14, 2024, production confirming abandonment of its reimbursements). This mismanagement delays administration, risks asset value loss, and burdens the estate in this active Chapter 7 case, contrary to the *Handbook for Chapter 7 Trustees*. *See* Trustee Handbook at ch. 4.C at 4-2; *id.* at 6.B at 6-2.

      i.     **Abandonment of DLA Reimbursements and Misstatements Related Thereto**

41.      The invoices marked "CONTRACT ITEMS ARE TO BE REIMBURSED BY DLA ENERGY/DFAS," represent collectible estate assets, as verified by the DLA's response. *See* Ex. 1. Yet, the Trustee closed the Artisans Bank account before collecting these funds, abandoning them without court approval or notice. This violates his duty to "collect and reduce to money the property of the estate" under 11 U.S.C. § 704(a)(1), to ensure proper management of estate funds under 11 U.S.C. § 345, and to faithfully perform duties as conditioned by the bond under 11 U.S.C. § 322(a). *See* Trustee Handbook at ch. 2.L at 2-9; *see also id.,* at ch. 4.C.3.e at 4-5, ch. 5.E.4 at 5-9. The Trustee's failure to notify the United States Trustee of this abandonment, as required by 28 U.S.C. § 586, further breaches his duty to report incidents that may trigger bond claims or asset losses. Trustee Handbook at ch. 5.G.5.e at 5-22.

42.      At the June 30, 2022, hearing, the Trustee testified under oath that only $139,000 was available for administrative claims, implying insolvency. *See* D.I. 224 at 25:24 – 26:8. This was incorrect, as the Artisans Bank account held $175,749.23 Ex. 5, and the uncollected DLA reimbursements that DLA later confirmed, *see* Ex. 1, added $128,747.89, totaling over $304,000.

43.      This misstatement parallels the Trustee's July 16, 2024, filing, *see* Ex. 2, wherein he claimed estate insolvency based on the FEMA Cancellation Claim's denial while retaining the $5.7 million Change Order Claim without pursuit. This pattern of deeming assets worthless yet retaining them obstructs recovery, delays case closure, and incurs costs (e.g., bond premiums),

A028

violating 11 U.S.C. § 704(a)(1) and (a)(9), as well as the Handbook's mandate for expeditious administration. *See* Trustee Handbook at ch. 6.D at 6-4.

### ii.    Pattern of Mismanagement Supports Compelled Abandonment

44.    The Trustee's abandonment of the DLA reimbursements, without investigating their collectability in line with 11 U.S.C. § 704(a)(4), mirrors his handling of the FEMA Claims. *See* Trustee Handbook at ch. 4.E at 4-27; *but see* Ex. 4. Despite receiving comprehensive documentation for the $5.7 million Change Order Claim, he refused to pursue or authorize its filing by the October 6, 2023, deadline, risking its loss. *See* Ex. 3. Similarly, he retains the $13.5 million Cancellation Claim despite its denial, blocking the Movants' pursuit at no estate cost.

45.    This conduct constitutes constructive abandonment, as the Trustee retains assets without any intent to administer them, breaching his duty to maximize creditor returns under 11 U.S.C. § 704(a)(1) and to provide information to parties in interest under § 704(a)(7). *See* Trustee Handbook at ch. 4.C.3.e at 4-5 – 4-6. Such serious mishandling may constitute cause for removal under 11 U.S.C. § 324, highlighting the need for court intervention to compel abandonment. *See* Trustee Handbook at 6.D.1 at 6-4; *see also In re Stetson & Assocs.*, Inc., 330 B.R. 613, 624 (Bankr. E.D. Tenn. 2005); *In re Slack,* 290 B.R. 282, 284 (Bankr. D.N.J. 2003).

### iii.    Relief Sought Aligns with the Motion

46.    The Trustee's failure to collect $128,747.89 in DLA reimbursements, *see* Ex. 1, while claiming fund shortages, underscores his inability to administer valuable assets like the FEMA Claims. Compelling abandonment of the FEMA Claims under 11 U.S.C. § 554(b), as requested in the Motion, would:

    a.    remove administrative burdens;

    b.    enable the Movants to pursue the claims at no estate cost; and

A029

     c.     expedite case closure, fulfilling the Trustee's duties under 11 U.S.C. §

704(a)(1) and (a)(9).

47.     The DLA abandonment exemplifies the harm of the Trustee's inaction, risking

further loss of the FEMA Claims' value (e.g., due to statutes of limitations) and supporting the

Motion's urgency in this active Chapter 7 case.

**E.     The Trustee's Avoidance of Fiduciary Duties**

48.     The Trustee's failures transcend mere negligence and evince complete avoidance

of his fiduciary duties. The record demonstrates that Trustee had actual knowledge of substantial

ongoing business operations worth millions of dollars, yet chose to ignore his statutory

obligations under 11 U.S.C. § 704(a)(1)-(2) and § 721.

**i.     Documentary Evidence of Active Operations and Avoidance Thereof**

49.     Following the March 31, 2022, conversion to Chapter 7, the Debtor continued

receiving active government fuel supply requests under its $3 million DLA MATOC contracts.

*See* D.I. 443-1, D.I. 443-5. Movants systematically forwarded every contract order to the Trustee

and debtor's counsel, ultimately sending over 3,800 fuel requests before the contracts were

canceled. *See, e.g.,* D.I. 443-8. These communications demonstrated ongoing government

contract opportunities representing millions in potential estate value, including direct inquiries

from DLA contracting officer Francis Murphy asking why the Debtor was not performing on its

contracts.

50.     Rather than addressing these substantial business operations, Trustee failed to

fulfil his responsibilities. When copied on correspondence in January 2023, Trustee responded:

"Please send all future correspondence through your counsel to my counsel." Ex. 6. Similarly,

debtor's counsel, who is himself a Chapter 7 Panel Trustee and fully aware of § 721

requirements, stated: "You can stop sending me these emails." Ex. 7.

51.     Most notably, at the January 23, 2023, preliminary injunction hearing, the

Trustee's lead accountant in this matter and Panel Trustee for Region 3, William Homony,

testified on his cross-examination as follows:

> **Q**: Is your office receiving various quote requests that are being provided by
> Steven Acosta?
> **A**: Yes.
> **Q**: Can you tell me what those are?
> **A**: I believe they are requests to supply fuel to the U.S. Government.
> **Q**: And those requests have not been satisfied, correct?
> **A**: Correct.
> **Q**: And does the trustees office intend to satisfy those requirements under the
> quote requests?
> **A**: I don't believe so.

*See* D.I. 291 at 142:2 – 142:12.

52.     This testimony constitutes an admission that the Trustee's office knew of valuable

U.S. government contracts, admitted they were not fulfilling them, and had no intention of

performing under these contracts.

**ii.     Violation of Fiduciary Duties**

53.     This pattern demonstrates an abject failure to exercise fiduciary duties beyond

mere negligence. The Trustee had direct, documented knowledge of valuable ongoing operations

through 3,800+ fuel requests. Yet, he actively discouraged further communication about estate

assets, breaching his duties under statute and the Trustee Handbook. *See* 11 U.S.C. § 721; *see*

*also* Trustee Handbook at ch. 4.I. at 4-30. Debtor's counsel's participation as a panel trustee who

knew the legal requirements makes this coordinated avoidance even more egregious.

54.     Willful avoidance also violates the Trustee's fundamental statutory duties to

collect and liquidate assets expeditiously under 11 U.S.C. § 704(a)(1), be accountable for estate

A031

property under § 704(a)(2), and seek authorization for ongoing business operations under § 721.

The sustained pattern of non-performance transforms this case from negligent administration to a

blatant and undeniable breach of fiduciary duty, necessitating immediate abandonment to

preserve remaining estate value and prevent further harm to creditors and the estate.

\*\*\*

**WHEREFORE**, the Movants respectfully request that this Court enter an Order,

substantially in the form attached hereto, compelling the Trustee to abandon the FEMA Claims to

the Movants.

**Dated**: July 15, 2025

**JOHN S. MALIK, ESQ.**
/s/ JOHN S. MALIK
DE Bar No. 2320
Attorney at Law
100 East 14th Street
Wilmington, DE 19801
Phone: 302-427-2247
Email: jmalik@malik-law.com

**RANDY M. MOTT, ESQ.**
/s/ Randy M. Mott
DC Bar 211037
1627 K St. N.W. Suite 400
Washington, DC 20006
Phone: 202-470-0106
Email: randymott@rmottlaw.com
(admitted pro hac vice)

*Counsel to Deborah Evans Mott,*
*Steven M. Acosta, Christopher*
*Mott, and John S. Maciorowski*

A032

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | **Hearing Date: August 20, 2025 at 9:30 a.m.**<br>**Objection Deadline: July 30, 2025 at 4:00 p.m.** |

## <u>NOTICE OF MOTION</u>

**PLEASE TAKE NOTICE** that Deborah Evans Mott, Steven M. Acosta, Christopher Mott, and John S. Maciorowski filed the Motion of the Owners of Debtor to Compel Abandonment of Property of the Estate (the "Motion") in this active Chapter 7 case.

**PLEASE TAKE FURTHER NOTICE** that a Hearing on the Motion will be held on **August 20, 2025, at 9:30 a.m.** before The Honorable Craig T. Goldblatt, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware, 19801.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the entry of an order approving the Motion must be filed by **July 30, 2025, at 4:00 p.m.** (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824 North Market Street, Wilmington, Delaware, 19801. A copy of any objection must be served upon the undersigned counsel so as to be received on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that, if you fail to respond in accordance with this notice, the Court may grant the relief requested and enter a final order without further notice.

**Dated**: July 15, 2025

**JOHN S. MALIK, ESQ.**
/s/ JOHN S. MALIK
Attorney at Law

A033

DE Bar No. 2320
100 East 14th Street
Wilmington, DE 19801
Phone: 302-427-2247
Email: jmalik@malik-law.com

**RANDY M. MOTT, ESQ.**
/s/ Randy M. Mott
DC Bar 211037
1627 K St. N.W. Suite 400
Washington, DC 20006
Phone: 202-470-0106
Email: randymott@rmottlaw.com
(admitted pro hac vice)

*Counsel to Deborah Evans Mott,*
*Steven M. Acosta, Christopher*
*Mott, and John S. Maciorowski*

A034

A035

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing *Motion to Compel Abandonment of Property of the Estate* with the Clerk of the Court for the United States Bankruptcy Court for the District of Delaware by using the CM/ECF system. Participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ John S. Malik*
John S. Malik

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Team Systems International, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | Re: D.I. 643 |

## CHAPTER 7 TRUSTEE'S OBJECTION TO MOTION OF THE OWNERS OF DEBTOR TO COMPEL ABANDONMENT OF PROPERTY OF THE ESTATE

George L. Miller, the Chapter 7 Trustee of the estate of the above-captioned Debtor, objects to the *Motion of the Owners of Debtor to Compel Abandonment of Property of the Estate* [D.I. 643] (the "Motion") filed by the Debtor's former managers and members ("Movants") and respectfully states as follows:

## OBJECTION

1.      This is the third time Movants have attempted to compel the Trustee to abandon property of the estate to them.[1]  The last time, Movants relied on fake AI-hallucinated case law that misrepresented the legal basis for their request and forced the motion to be withdrawn and Movants' then-Delaware counsel to resign.  This time, with their third set of Delaware counsel in place, Movants rely on outright misrepresentations of fact.

2.      "[A] trustee is given wide discretion in making the decision to abandon property." *In re Wilton Armetale, Inc.*, 618 B.R. 424, 433 (Bankr. E.D. Pa. 2020); *In re Syntax-Brillian Corp.*, No. 08-11407 (KJC), 2018 WL 3491758, at *15 (Bankr. D. Del. July 18, 2018) ("The Trustee's power to abandon property is discretionary . . . .") (internal citation omitted).  As the parties seeking abandonment, Movants bear the burden of proof. *Wilton Armetale*, 618 B.R. at 433.  The Motion

---

[1] Motion at D.I. 310 (May 3, 2023), withdrawn at D.I. 385 (Oct. 19, 2023); Motion at D.I. 612 (Feb. 18, 2025), withdrawn a D.I. 615 (Feb. 26, 2025).

A036

does not attach a declaration or any other evidence in support of Movants' assertions. Thus, Movants have failed to make a prima facie case and have offered no basis to overrule the Trustee's discretion and compel abandonment. Instead, Movants rely on misrepresentations of fact about the Defense Logistics Agency ("DLA") invoices and recycled arguments about the FEMA claims.

**The DLA Invoices Were Paid Prepetition and**
**<u>Movants Had the Documents Proving This Before They Filed the Motion</u>**

3.      Throughout the Motion, Movants assert that there are "$128,747.89 in readily collectible Defense Logistics Agency ("DLA") reimbursements . . . ." Motion ¶ 2; *id.* ¶¶ 3-4, 40-47. Movants assert that the following DLA invoices are unpaid:

> "a. October 20, 2021: $29,287.98 (Invoice 54878)
> "b. November 8, 2021: $22,931.01 (Invoice 55229)
> "c. December 7, 2021: $48,444.90 (Invoices 55341 and 55398)
> "d. December 12, 2021: $28,084.00 (Invoice 55369)"

Motion ¶ 3.

4.      These assertions are demonstrably false and Movants had the documents proving the falsity of these allegations for more than one year before the Motion was filed.

5.      Attached to this Objection as <u>Exhibit A</u> are copies of the bank statements for the Debtor's former account at Artisan's Bank for the months of November 2021, December 2021, and January 2022, the period immediately preceding the petition date. These bank statements are marked with Bates stamps beginning "TSI-", reflecting that they were produced by Debtor's counsel to the Trustee shortly after conversion. The documents also are marked with Bates stamps beginning "P-", reflecting that they were produced by the Trustee to Movants' counsel in May 2024 as part of the Trustee's first document production in the adversary proceeding.

6.      The Artisan's bank statements demonstrate that the DLA invoices were paid to the Debtor prior to the petition date, as summarized in the following chart:

2

A037

| Bates Nos. | Statement Date | Payment Date | Amount | Corresponding Invoice(s) |
|---|---|---|---|---|
| TSI000841 P0002200 | 11/30/21 | 11/18/21 | $29,187.49 | 54878 |
| TSI000834 P0002193 | 12/31/21 | 12/6/21 | $22,869.63 | 55229 |
| TSI000811 P0002197 | 1/31/22 | 1/5/22 | $48,307.59[2] | 55341 and 55398 |
| TSI000811 P0002197 | 1/31/22 | 1/10/22 | $28,004.40 | 55369 |

7.    Movants have in their possession other documents that are dispositive and show the DLA invoices were paid prepetition.

8.    Attached to this Objection as Exhibit B is a document produced by the DLA to the Trustee in discovery in the adversary proceeding and then produced by the Trustee to Movants' counsel in May 2024.  The DLA document is part of the same production that includes a letter from DLA that is attached as Exhibit 1 to Movants' Motion, demonstrating that Movants had this document before they filed the Motion, but now ignore the same dispositive documents in demanding reimbursement on the DLA invoices that were already paid prepetition.

9.    Page 3 of the DLA document (marked Bates page no. P0009464) shows that DLA paid all of the Debtor's invoices, including the five invoices identified in the Motion.  The DLA document ties the payment amounts listed on the Artisan's bank statements summarized above to the invoice amounts listed in the Motion.

10.    Below is an excerpt of the DLA document (Exhibit B) reflecting the invoice amounts and the net amounts paid to the Debtor:

---

[2] This amount equals the sum of $20,303.19 and $28,004.40 paid by DLA as set forth on Exhibit B and below.

3

A038

| 10/21/2021 | 50.5 | 29,287.98 | 0 | 29,287.98 | 11/18/2021 |
| 10/21/2021 | -50.5 | -100.49 | 0 | -100.49 | 11/18/2021 |
|  | 0 | 29,187.49 | 0 | 29,187.49 |  |
|  | 0 | 29,187.49 | 0 | 29,187.49 |  |
| 11/08/2021 | 31 | 22,931.01 | 0 | 22,931.01 | 12/06/2021 |
| 11/08/2021 | -31 | -61.38 | 0 | -61.38 | 12/06/2021 |
|  | 0 | 22,869.63 | 0 | 22,869.63 |  |
|  | 0 | 22,869.63 | 0 | 22,869.63 |  |
| 12/08/2021 | 29 | 20,360.90 | 0 | 20,360.90 | 01/05/2022 |
| 12/08/2021 | -29 | -57.71 | 0 | -57.71 | 01/05/2022 |
|  | 0 | 20,303.19 | 0 | 20,303.19 |  |
|  | 0 | 20,303.19 | 0 | 20,303.19 |  |
| 12/08/2021 | 40 | 28,084.00 | 0 | 28,084.00 | 01/05/2022 |
| 12/08/2021 | -40 | -79.6 | 0 | -79.6 | 01/05/2022 |
|  | 0 | 28,004.40 | 0 | 28,004.40 |  |
|  | 0 | 28,004.40 | 0 | 28,004.40 |  |
| 12/13/2021 | 40 | 28,084.00 | 0 | 28,084.00 | 01/10/2022 |
| 12/13/2021 | -40 | -79.6 | 0 | -79.6 | 01/10/2022 |
|  | 0 | 28,004.40 | 0 | 28,004.40 |  |
|  | 0 | 28,004.40 | 0 | 28,004.40 |  |

Exhibit B, page 3.

11.  As set forth above and on Exhibit B hereto, (i) the net amount of $29,187.49 was paid to the Debtor on November 18, 2021; (ii) the net amount of $22,869.63 was paid to the Debtor on December 6, 2021; (iii) the net amounts of $20,303.19 and $28,004.40, which total $48,307.59, were paid to the Debtor on January 5, 2022; and (iv) the net amount of $28,004.40 was paid to the Debtor on January 10, 2022.  These amounts directly correspond to the deposit amounts shown on the Debtor's Artisan's bank statements on these dates, as reflected on Exhibit A hereto.

12.  In sum, Movants have failed to establish that there are any unpaid DLA invoices that could be abandoned and, for that reason, the Motion fails.

13.  Importantly, Movants have had the documents that show the DLA invoices were paid before they filed the Motion.  Movants would have had the Artisan's bank statements pre-petition.  They may have had the DLA documents as well.  By no later than May 2024, Movants

4

A039

had these documents when they were produced in discovery in the adversary proceeding.  That was more than one (1) year before the Motion was filed.

14.    The DLA invoices were paid in the two-month period prior to the bankruptcy filing. The payments of the DLA invoices represented the majority of the income deposited into the Debtor's Artisan's account during that period.  It is simply not credible that Movants did not know these invoices had been paid.

15.    Notably, in their prior motion to compel abandonment filed on February 18, 2025 [D.I. 612], Movants made <u>no</u> mention of any unpaid DLA invoices.  Movants attempted to withdraw that motion after it was shown that Movants apparently relied on AI-generated case law citations.  *See Chapter 7 Trustee's Objection to Motion to Compel Abandonment of Property of the Estate* [D.I. 614].

16.    In the present Motion, Movants have replaced made-up case law with made-up facts.  And Movants knew those facts were made up when they filed the Motion.  This is just the latest example of Movants unreasonably and vexatiously multiplying the proceedings in this case.

**Movants' Arguments About the FEMA Claim**
**<u>Do Not Support Abandonment</u>**

17.    Turning to the FEMA claims, throughout this case, Movants have repeated a false narrative that there were millions of dollars in FEMA claims just waiting to be collected.

18.    At the conversion hearing, Mr. Acosta testified that the so-called Change Order Claim (then assigned a value of $6.8 million, now asserted to be either $5.7 million or $3.6 million) would be submitted that week.[3]  It was not.

---

[3] *See* Mar. 3, 2022 Hr'g Tr. [D.I. 140] at 207:11-13 ("We have the FEMA claim for 13.5 million for the restocking, we have the claim that we're putting in, I believe, this week for the change order . . . ."); 208:16 ("We want to have it [the Change Order Claim] submitted by the end of this week.").

5

19.     In September 2023, Movants represented to the Court that payment from FEMA was forthcoming.[4]  Nearly two years later, FEMA has not made any payment.

20.     The Trustee's efforts to pursue the FEMA claims on behalf of the estate are well-documented.  The Trustee retained Venable—a law firm experienced with government contracts that Movants had retained prepetition and that Movants had encouraged the Trustee to retain—on a contingency fee basis to pursue the Cancellation Claim, also referred to as the "restocking fee" claim.  *See* Order at D.I. 221.  Venable pursued the Cancellation Claim through the U.S. Civilian Board of Contract Appeals and the U.S. Court of Appeals for the Federal Circuit, where the issues were fully briefed and oral argument was presented.  The Federal Circuit rejected the Cancellation Claim.   *See* Letter at D.I. 528.  Thereafter, Movants asserted that they believed there was still a path to pursue the Cancellation Claim.  The Trustee repeatedly requested that Movants provide information and meet with the Trustee.  Movants ignored the Trustee's requests.

21.     With respect to the Change Order Claim, as far back as the conversion hearing in March 2022, Movants were unable to answer basic questions about this claim and why Movants had never filed it.  *See Memorandum Opinion* at 3, 35-37 [D.I. 146] (Mar. 30, 2022).  In the more than three (3) years since then, Movants have still not satisfactorily answered those questions.

22.     In the Motion, Movants assert that "[t]he Change Order Claim stems from FEMA's unilateral modification of the contract's shipping requirements from breakbulk to container shipping . . . ."  Motion ¶ 23.  Despite repeated questions, Movants have failed to explain why contemporaneous Debtor emails show Deborah Mott and others discussing shipping the water to Puerto Rico in containers in September 2017 and October 2017, before FEMA allegedly modified the contract.

---

[4] *See, e.g.*, Sept. 20, 2023 Hr'g Tr. 7:19-12:25.

A041

23. Movants also have failed to provide a satisfactory explanation for why the amount of the Change Order Claim continues to evolve—from $6.8 million to $5.7 million to, perhaps, $3.6 million—despite the fact that the events in question occurred in 2017.

24. The Trustee has repeatedly asked Movants for all documents relating to the FEMA claims, and Movants have failed and refused to provide them. In particular, paragraph 24 of the Motion lists several categories of documents that Movants claim they produced to the Trustee, but that assertion is false.

25. After Movants filed their prior abandonment motion in February 2025, the Trustee's counsel contacted Movants' counsel and requested that Movants produce the documents referenced in the prior motion, including (i) "Itemized subcontractor costs showing $5.7 million in container-specific expenses," (ii) "Supporting documentation differentiating these costs from other contract expenses totaling over $3.6 million," (iii) "Contemporaneous correspondence with FEMA about the shipping changes," (iv) "Internal accounting records tracking the cost impact," and (v) "Detailed cost calculations and explanations, " among other documents. In response, Movants' counsel simply re-circulated two emails from October 2023, neither of which contains any of the above-listed categories of documents and neither of which addresses the Trustee's questions about the lack of competent evidence regarding the Change Order Claim.

26. The Trustee has explained to Movants that the Debtor lacks a credible witness and party who could sign a good faith certificate in support of a claim against FEMA. One of the Debtor's former managers, Ms. Mott, has been indicted for perjury[5] and the other, Mr. Acosta, has

---

[5] *See United States v. Mott*, 24-cr-77 (MN) (D. Del.).

provided testimony that the Court found was not credible.[6]  Given the lack of competent evidence and the lack of a credible witness, no FEMA claim could be asserted at this stage in good faith.

27.    The Trustee has repeatedly explained to Movants that filing a false or unsubstantiated claim could result in significant liability to the estate.  *See*, *e.g.*, 41 U.S.C. § 7103(c)(2) ("If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim. . . . .").  The Trustee's concern that Movants would submit a false or unsubstantiated claim is not hypothetical—the Motion proves they would do so, because it seeks to collect on DLA invoices that Movants must know were already paid.

28.    Further, Movants have made no offer to indemnify the estate for the real risk that they could expose the estate to significant liability, nor could Movants provide any such indemnity given that Movants remain subject to this Court's Preliminary Injunction Order.

29.    The Motion suffers from other fatal flaws.  For example, the Motion contains no details about the possibilities of success.[7]  The Motion says nothing about how the costs of pursuing the FEMA claims will be paid—Movants remain subject to this Court's Preliminary Injunction Order, which does not permit them to make these types of non-ordinary course payments.

---

[6] *See Memorandum Opinion* on sanctions, 23-50004-CTG, Adv. D.I. 256 at 11 n. 29 (discussing Mr. Acosta's testimony regarding the "unpainted" Debtor bank statements and finding such testimony not credible).  Notably, those "unpainted" Debtor bank statements have never been produced to the Trustee.

[7] Movants' prior abandonment motion states that "the probability of recovery may be less than one percent."  *Motion to Compel Abandonment of Property of the Estate* ¶ 21 [D.I. 612].

30.     In this case there are more than $8 million in unpaid creditor claims.  It would be manifestly inequitable to compel the abandonment of estate property to benefit equity holders, when those same equity holders have failed and refused to produce to the Trustee the very documents and information necessary to investigate the FEMA claims on behalf of the estate and creditors.

31.     Throughout this case, the Trustee has aggressively pursed recoveries on behalf of the estate.  For example, the Trustee recently reached two more settlements, which were approved by the Court, and the Trustee continues to pursue other avenues of recovery.

32.     By contrast, at every turn, Movants have obstructed the administration of the estate and the Trustee's investigation, have withheld documents and refused to comply with discovery, and have multiplied the proceedings with meritless filings, of which the Motion is only the latest example.

33.     Movants have provided no basis to override the Trustee's discretion and to compel abandonment of property of the estate.  Movants have offered no evidence to support their Motion. Instead, they rely on misrepresentations about the DLA invoices and non-credible arguments about the FEMA claims.  For all these reasons, the Motion should be denied with prejudice and the Court should consider whether additional measures are appropriate.  In addition to denying the Motion, the Court should require counsel for Movants to pay the Trustee's attorneys' fees for yet another vexatious[8] filing and should require that any future motion filed by the Movants be accompanied

---

[8] Movants continue to take unfounded cheap shots at the Trustee.  *See*, *e.g.*, Motion, ¶ 1 ("The Trustee's ongoing refusal to administer or abandon these claims in this active case delays administration, risks permanent loss of value, and incurs unnecessary costs, *violating his fiduciary duties . . . .*") (emphasis added).  Notwithstanding, prior to filing this Objection, the undersigned counsel for the Trustee wrote to Mr. Malik requesting that he withdraw the Motion, as the factual premise was false.  Mr. Mailk did not respond to that request and has not withdrawn the Motion, requiring the Trustee to file this Objection.

by an affidavit or declaration of a Movant.  There should be consequences for Movants and their counsel repeatedly wasting estate resources.

<strong><u>CONCLUSION</u></strong>

WHEREFORE, the Trustee respectfully requests that the Cout deny the Motion in its entirety with prejudice and grant the Trustee such other and further relief as is just and proper.

Dated: July 29, 2025                              CHIPMAN BROWN CICERO & COLE, LLP

*/s/ Bryan J. Hall*
David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
1313 N. Market Street, Suite 5400
Wilmington, Delaware 19801
(302) 295-0191
(302) 295-0199 (fax)
carickhoff@chipmanbrown.com
hall@chipmanbrown.com

-and-

Adam D. Cole, Esq. (admitted *pro hac vice*)
501 5th Ave., 15th Floor
New York, New York 10017
(646) 685-8363
cole@chipmanbrown.com

*Counsel for the Chapter 7 Trustee*

A045

**CHIPMAN BROWN CICERO & COLE, LLP**
HERCULES PLAZA
1313 NORTH MARKET STREET, SUITE 5400
WILMINGTON, DELAWARE 19801
WWW.CHIPMANBROWN.COM

BRYAN J. HALL
(302) 434-4405
HALL@CHIPMANBROWN.COM

**CHIPMAN BROWN
CICERO & COLE**

**DELAWARE | NEW YORK**

January 6, 2026

**By CM/ECF**

Honorable Craig T. Goldblatt
United States Bankruptcy Court
For the District of Delaware
824 N. Market Street, Third Floor
Wilmington, Delaware 19801

      Re:   *In re Team Systems International, LLC*, Case No. 22-10066-CTG
             Letter Motion to Prohibit the TSI Members from Offering Evidence Based upon
             Their Failure to Comply with Discovery Regarding their Abandonment Motion

Dear Judge Goldblatt:

      This firm is counsel to George L. Miller, the Chapter 7 Trustee (the "Trustee") of the estate of the above-referenced Debtor.

      The Court has scheduled a hearing for January 23, 2026 (the "Hearing") on, among other things, the adjourned hearing on the *Motion of the Owners of Debtor to Compel Abandonment of Property of the Estate* [D.I. 643] (the "Abandonment Motion") filed by Deborah Evans Mott, Steven M. Acosta, Christopher Mott, and John S. Maciorowski (collectively, the "TSI Members").

      As set forth more fully below, the Trustee sought document discovery and a deposition of Mr. Acosta, but the TSI Members have refused to produce a single document and failed to make Mr. Acosta available for deposition.

      For the reasons set forth below, the Trustee respectfully requests that the Court prohibit the TSI Members from offering at the Hearing witnesses or documents that the TSI Members failed to produce in response to the Trustee's discovery requests.

**RELEVANT BACKGROUND**

      On July 15, 2025, the TSI Members filed the Abandonment Motion. On July 29, 2025, the Trustee filed his Objection [D.I. 645] to the Abandonment Motion. On August 1, 2025, the TSI Members filed their Motion for Leave to Withdrawal of Abandonment Claims on Invoices to the Defense Logistics Agency [D.I. 646]. On August 8, 2025, the TSI Members filed their Reply [D.I. 647] (the "Reply") in support of the Abandonment Motion.

A046

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 2

The Abandonment Motion was originally noticed for hearing on September 10, 2025. At the request of the TSI Members, the hearing date was adjourned to November 17, 2025 for an evidentiary hearing. Thereafter, at the request of the TSI Members, the hearing on the Abandonment Motion was adjourned for a second time to January 23, 2026.

### Discovery Requests

Because the TSI Members requested an <u>evidentiary hearing</u>, on September 19, 2025, the Trustee, through counsel, served his (i) first set of requests for production of documents and tangible things ("RFPs") and (ii) first set of interrogatories directed to the TSI Members ("ROGs," and together with the RFPs, the "Discovery Requests"). *See* Notice of Service at D.I. 653. Copies of the RFPs and ROGs are attached hereto as <u>Exhibits A and B</u>, respectively.

On October 21 and 27, 2025, the TSI Members served their responses and objections to the RFPs and ROG, respectively, which are attached hereto as <u>Exhibits C and D</u>, respectively (collectively, the "Responses").

Importantly, as discussed below, in their Responses the TSI Members (i) refused to produce a single document requested by the Trustee, (ii) refused to identify witnesses, and (iii) refused to identify documents the TSI Members allege they previously produced.

### Acosta Deposition

On October 28, 2025, the Trustee served the notice of deposition of Mr. Acosta. *See* Notice of Deposition at D.I. 655 and attached hereto as <u>Exhibit E</u>. The deposition notice includes a list of topics that are directly related to the Abandonment Motion and the Reply.

Between October 28, 2025 and November 4, 2025, counsel for the Trustee sent several emails to the TSI Members' counsel regarding the deposition of Mr. Acosta and requesting to meet and confer.

On November 4, 2025, Mr. Acosta filed a motion in the adversary proceeding, but not in the main case where the Abandonment Motion is pending, seeking to quash the deposition.[1] *See* Adv. Proc. No. 23-50004, Adv. D.I. 446.

Counsel for the Trustee and counsel for the TSI Members held meet and confer calls on November 5, 2025 and November 6, 2025, as well as subsequent discussions. Counsel for the TSI Members initially indicated Mr. Acosta would not be made available for a deposition. Later,

---

[1] The motion to quash raises three arguments—procedural issues, Fifth Amendment, and lack of knowledge—each of which lacks merit. Sufficient notice of the deposition was provided under the local rules. *Compare* Del. Bankr. L.R. 7030-1(b) (requiring at least seven days notice) *with* Notice of Deposition at <u>Exhibit E</u> (served nine days before the proposed deposition, and counsel offered to accommodate other later dates). Further, the Trustee was not required to seek leave of Court prior to noticing Mr. Acosta's deposition. The Trustee was not a party to the Florida litigation and has not previously noticed Mr. Acosta's deposition either in this case or with respect to the Abandonment Motion. Mr. Acosta's remaining arguments in the motion to quash regarding the Fifth Amendment and his personal knowledge of the relevant facts are addressed below.

A047

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 3

counsel indicated Mr. Acosta might be willing to appear for a virtual deposition but would invoke the Fifth Amendment.  However, to date, Mr. Acosta has not been made available for a deposition.

## THE TSI MEMBERS FAILED TO COMPLY WITH DISCOVERY

The TSI Members, as the movants, have the burden of proof on their Abandonment Motion. *See In re Wilton Armetale, Inc.*, 618 B.R. 424, 433 (Bankr. E.D. Pa. 2020).

Notwithstanding, the Abandonment Motion does not attach or include a supporting declaration.  *See generally* Abandonment Motion [D.I. 643].  On the contrary, the Abandonment Motion and Reply contain a series of bald factual assertions that remain unsupported.  Further, no foundation has been laid for the handful of documents that were attached to the Abandonment Motion or the Reply.

The Trustee is within his rights to seek discovery in connection with the TSI Members' Abandonment Motion, which is the third such motion filed in this case seeking to compel abandonment.  *See* Fed. R. Bankr. P. 9014(c), 7030, 7033, 7034; Fed. R. Civ. P. 30, 33, and 34. The TSI Members' failure and refusal to cooperate with discovery, produce documents, answer interrogatories, or make a witness available is grounds to prohibit the TSI Members from introducing any such documents or witness testimony at the Hearing.

### The Discovery Requests Are Narrowly Tailored and Seek Relevant Information

The Abandonment Motion and Reply contain a serious of unsupported factual assertions, to which the Trustee directed Discovery Requests.

For example, in paragraph 24 of the Abandonment Motion, the TSI Members make the following representations:

> "24.    Over a year ago, Ms. Mott and Mr. Acosta provided the Trustee
> with comprehensive documentation, see Ex. 3, including:
> - a.    Itemized subcontractor costs showing $5.7 million in container-specific expenses;
> - b.    Supporting documentation differentiating these costs from other contract expenses totaling over $3.6 million;
> - c.    Payment records confirming the Debtor's disbursement;
> - d.    Bank records verifying payments;
> - e.    Correspondence with FEMA about the shipping changes;
> - f.    Internal accounting records tracking cost impact; and
> - g.    Detailed cost calculations and explanations."

Abandonment Motion ¶ 24.

The Trustee requested copies of all documents identified above.  *See* RFPs 19-25 (<u>Exhibit A</u>, pp. 4-5).  The TSI Members refused to produce them.  *See* Responses to RFPs 19-25 (<u>Exhibit C</u>, pp. 8-9).  Instead, as set forth more fully on <u>Exhibit C</u>, the TSI Members responded with some

A048

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 4

variation of either the documents "have been" provided or produced, *see* Responses to RFPs 21, 22, 24, and 25, or "the produced documents referred to are extensive and counsel believes that they provide all of the necessary information," *see* Responses to RFPs 19, 20, 23. *See id.* Such responses are patently insufficient in light of the specific representations made by the TSI Members in paragraph 24 of the Abandonment Motion.

Each of the above-listed documents, to the extent they exist, are relevant to the relief requested by the TSI Members. That is why the Trustee has requested these documents multiple times, including by the Discovery Request, but the TSI Members continue to withhold such documents.

Further, as set forth above, paragraph 24 of the Abandonment Motion refers to "payment records," "bank records," and "internal accounting records tracking cost impact." *See* Abandonment Motion ¶ 24(c), (d), (f). While certain documents were attached as exhibits to the Abandonment Motion and to the Reply, even a cursory review of such documents shows that they are not payment records, bank records, or accounting records.

As another example, on page 8 of the Reply, the TSI Members make the following representation:

> "The TSI Members **provided an expert report** validating the [Change Order] claim's merit and recommending its pursuit. *See* D.I. 643-3."

Reply, p. 8 (emphasis added).

The Trustee requested that the TSI Members produce "All Documents concerning Your contention on page 8 of the Reply that there is an "expert report validating the . . . merit and recommending . . . pursuit" of the Change Order Claim, including without limitation copies of all versions and drafts of such expert report." RFP 31 (Exhibit A at p. 5).

The TSI Members responded as follows:

> "All such documents known to counsel have been produced and were included in emails to the Trustee as well. The Trustee has the same documents that any expert would be provided by the TSI members. If and when an expert report becomes necessary under the Local Rules, the Defendants will provide one in a timely, compliant manner."

Response to RFP 31 (Exhibit C, p. 11).

The TSI Members' answer is not responsive because the Trustee did not ask about a hypothetical expert report, he requested the expert report that the TSI Members represented in their Reply (a) already exists and (b) was previously "provided" to the Trustee. To date, no such expert report has been produced or even identified. Indeed, the reference to an "expert report" in the Reply is surprising given the TSI Members' former counsel represented that "We do not have any

4

A049

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 5

expert reports, and none are needed to calculate this claim." *See* Abandonment Motion, Exhibit 3, at page 6 (email of M. Munoz, dated Oct. 5, 2023) [D.I. 643-3].[2]

As a further example, on pages 8-9 of the Reply, the TSI Members make the following representation:

> "The cost differential between breakbulk and container shipping methods is well-documented in industry standards, and the **TSI Members possess detailed cost documentation** establishing both the government's directive nature of the shipping change and the quantifiable additional costs incurred. *See, e.g.,* D.I. 643-3."

Reply, p. 8-9 (emphasis added).

The Trustee requested that the TSI Members produce "All Documents concerning Your contention on pages 8-9 of the Reply that 'the TSI Members possess detailed cost documentation establishing both the government's directive nature of the shipping change and the quantifiable additional costs incurred[,]' including without limitation copies of all such detailed cost documentation." RFP 33 (Exhibit A at p. 6).

The TSI Members responded as follows:

> "**Response:** Documents response to this request known to counsel have already been produced. *See* General Objection."

Response to RPF 33 (Exhibit C, p. 12). No such documentation has been produced.

In his Discovery Requests, the Trustee asked the TSI Members to identify any documents the TSI Members allege they previously produced to the Trustee:

> "To the extent that You contend any Document responsive to the Requests for Production has already been produced to the Trustee, identify any such Document by title and date, Bates number (if applicable), the date of production of such Document, and the manner by which production of such Document was made."

ROF 17 (Exhibit B at p. 5).

The TSI Members did not do so and, instead, responded as follows:

> "**ANSWER:** Objection as to Fifth Amendment. Counsel on information and belief has provided all such references in the Responses to the First Set of Requests for Production, the index contained in Exhibit A of the Responses to the First Set of Requests for Production, as well as through

---

[2] Needless to say, D.I. 643-3, which is cited on page 8 of the Reply as the basis for the representation that the "TSI Members provided an expert report," does not include any such expert report. *See generally* Abandonment Motion, Exhibit 3 [D.I. 643-3].

A050

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 6

> the indices cited therein. *See* D.I. 239-2 (index of TSI documents turned over at the beginning of the Chapter 11 case and subsequent documents turned over to the Trustee); *see also* D.I. 456-2 (index of some of the TSI documents turned over to the Trustee, then produced by the Trustee to TSI). The relevant documents are cited in the Motion and Reply."

Answer to ROG 17 (Exhibit D at p. 8).

In other words, the TSI Members have refused to identify the documents they allegedly produced to the Trustee. Instead, the TSI Members attached to their responses a 29-page chart that appears to list every document the TSI Members claim they produced to the Trustee since the case was converted to chapter 7. Among other things, the TSI Members' chart contains generic descriptions of documents, such as "Non TSI Business Documents" or "Bering Strait Document," which provide no information that would enable the Trustee or the Court to determine what was actually produced and whether it is are responsive to the Discovery Requests.

Moreover, the TSI Members' chart **does not list** many of the documents the TSI Members claim they previously produced to the Trustee. For example, the TSI Members' chart **does not list** any expert report, cost documentation, payment records, bank records, or internal accounting records tracking cost impact. *See generally* Responses to RFPs at Attachment A (Exhibit C). Therefore, based upon the TSI Members' own responses, it is undisputed that many of the relevant documents identified in the Abandonment Motion and Reply have not been produced by the TSI Members.

Additionally, in his Discovery Requests, the Trustee asked the TSI Members to identify any fact witnesses or expert witnesses they expect to call at the Hearing. *See* ROGs 1 and 2 (Exhibit B, pp. 1-2). Again, the TSI Members refused to do so. *See* Responses to ROGs 1 and 2 (Exhibit D, p. 3).

**The TSI Members Have Improperly Asserted the Fifth Amendment in**
**Refusing to Comply with Discovery and to Make Mr. Acosta Available for Deposition**

The Abandonment Motion and Reply contain a serious of unsupported factual assertions, to which the Trustee directed his Discovery Requests.

In refusing to produce documents and answer interrogatories, the TSI Members repeatedly assert the Fifth Amendment. This is problematic for several reasons.

First, as set forth above, the Abandonment Motion and Reply identify specific documents. The TSI Members cannot withhold documents where their existence, location, and authenticity of such documents are "foregone" conclusions. *Fisher v. United States*, 425 U.S. 391, 411 (1976).

Second, if the TSI Members cannot produce a witness with firsthand knowledge or other admissible evidence in support of the facts alleged, they cannot meet their prima facie burden for the relief they seek in the Abandonment Motion.

A051

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 7

Third, the Abandonment Motion and Reply contain extensive factual allegations. If the factual allegations in the Abandonment Motion and Reply are the statements of the TSI Members, then the TSI Members cannot invoke the Fifth Amendment to refuse to answer questions about them. *See, e.g., Rogers v. United States*, 340 U.S. 367, 373 (1951) ("[F]ederal courts have uniformly held that, where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details."); *Legend Biotech USA Inc. v. Liu*, No. 2:23-CV-02965-BRM-LDW, 2024 WL 919082, at *12 (D.N.J. Mar. 4, 2024) (granting plaintiff injunctive relief compelling defendant to produce devices, accounts, and documents, where defendant previously signed a document acknowledging the incriminating facts, citing both waiver and the "foregone conclusion" doctrine).

Alternatively, if the factual allegations contained in the Abandonment Motion and Reply are solely the statements of counsel, and not the statements of the TSI Members, that raises serious concerns under Fed. R. Civ. P. 11(b)(3) and Fed. R. Bankr. P. 9011(b)(3).

For his part, Mr. Acosta's refusal to appear for his deposition was premised on a blanket assertion of the Fifth Amendment. That violates controlling Third Circuit law. *See, e.g., National Life Ins. Co. v. Hartford Acc. and Indem. Co.*, 615 F.2d 595, 596 (3d Cir. 1980) ("We hold that a witness in a civil proceeding may not invoke a blanket fifth amendment privilege prior to the propounding of questions and, therefore, reverse the judgment of the district court."); *Winter v. Hyde*, No. CV 17-1280-LPS, 2019 WL 2022253, at *7 (D. Del. May 8, 2019) ("Before any Fifth Amendment privilege may attach, Plaintiff must clarify the basis for asserting the privilege, and do so with specificity."). During the meet and confer, the TSI Members' counsel seemed to acknowledge that applicable law requires a witness to appear and respond to the questions in order to invoke his Fifth Amendment right. To date, however, Mr. Acosta has not been made available for a deposition.

Further, Mr. Acosta resisted his deposition by asserting that he lack personal knowledge; however, the TSI Members' own Reply contains allegations regarding Mr. Acosta's knowledge and access to documents relevant to the FEMA claims and the Abandonment Motion. *See, e.g.,* Reply at pp. 5-6 (discussing Mr. Acosta's possession or access to "original business records"); Reply at p. 6 (discussing Mr. Acosta's "competence regarding the debtor's operations and financial affairs."); Reply at p. 13 (discussing Mr. Acosta's "detailed knowledge" of matters relating to the FEMA claims); Reply at pp. 14-15 (discussing Mr. Acosta's coordination with counsel and an expert regarding the FEMA claims and Mr. Acosta's having "provided detailed technical explanations when questioned about claim status."). The Trustee is entitled to test these assertions and other statements made in the Abandonment Motion and the Reply through a deposition of Mr. Acosta, who is one of the movants.

Additionally, **Mr. Acosta twice before testified in this case about the so-called FEMA claims**. *See, e.g.,* Tr. of March 9, 2022 Hearing at 197:14-198:22 (Acosta testimony regarding change order claim); 207:11-13 (Acosta testimony regarding both FEMA claims); 208:10-24 (Acosta testimony regarding change order claim); 213:4-22 (Acosta testimony regarding cancellation claim); 244:21-245:6 (Acosta testimony regarding FEMA contract); *see* Tr. of June 30, 2022 Hearing at 85:12-17 (Acosta testimony regarding FEMA claim); 88:4-89:12 (Acosta testimony regarding documents related to FEMA); 96:23-97:10 (Acosta testimony regarding

7

A052

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 8

emails related to FEMA).  Mr. Acosta cannot now refuse to testify regarding matters about which he has already testified in this case.

## **<u>RELIEF REQUESTED</u>**

A party that fails to timely provide information "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  *See, e.g., Schmidt v. Mars, Inc.*, 587 F. App'x 12, 16 (3d Cir. 2014) (affirming district court's order barring party from introducing testimony of a witness that it failed to disclose in discovery); *Cavicchia v. Philadelphia Hous. Auth.*, 137 F. App'x 495, 496 (3d Cir. 2005) (affirming district court's order striking exhibit that was not produced during discovery).  Factors to be considered include the prejudice to the other party, the ability of the non-producing party to cure the prejudice, potential disruption to the trial or hearing, the bad faith or willfulness of the non-producing party, and the importance of the excluded evidence.  *See, e.g., Trustid, Inc. v. Next Caller Inc.*, No. 18-172 (MN), 2021 WL 3015280, at *2 (D. Del. July 6, 2021) (citing, *inter alia, Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-905 (3d Cir. 1977)).

Here, the prejudice to the Trustee is clear.  The TSI Members are seeking to compel abandonment of estate property (itself, an extraordinary request) based upon allegations that the TSI Members already produced documents to the Trustee, but the TSI Members have refused to produce or identify the very documents they assert they previously produced.  Allowing the TSI Members to proceed at this stage would be highly disruptive:  Either the Hearing will go forward on January 23 and the Trustee will be forced to object each and every time the TSI Members attempt to introduce or refer to documents or information they have refused to produce in discovery or, alternatively, the Hearing will have to be adjourned **<u>for a third time</u>**, which undermines any assertion by the TSI Members that the relief requested is either necessary or time-sensitive.

It is also clear that the TSI Members have refused to produce discovery and Mr. Acosta refused to attend his deposition willfully and in bad faith.  They filed motion papers that required the Trustee and the estate to expend significant time and resources responding to.  The issues are not new.  In fact, this is the third motion seeking to compel abandonment.  The current motion contains specific allegations about specific documents, but the TSI Members have refused to produce such documents or even to provide the Bates numbers and dates when such documents were allegedly previously produced.  They also have refused to make Mr. Acosta available, even though the Reply touts Mr. Acosta's knowledge and access to records, and Mr. Acosta has previously testified in this case about these same matters.

We now know that, while the TSI Members have been dragging out the hearing on their Abandonment Motion with multiple adjournments, Ms. Mott and her husband continued to dissipate assets, namely, the real property located Blue Springs, Missouri property, in violation of the Court's Preliminary Injunction.  *See generally Motion of the Chapter 7 Trustee for Entry of an Order (i) Enforcing the Preliminary Injunction, (ii) Lifting the Stay Order, (iii) Directing Deborah Evans Mott and John S. Maciorowski to Show Cause Why They Should Not Be Held in Contempt, and (iv) Granting Related Relief* [D.I. 660].  The Court should not tolerate any further games from the TSI Members.

*Team Systems International, LLC*, 22-10066 (CTG)
January 6, 2026
Page 9

For the reasons set forth above, the Court should prohibit the TSI Members from offering, introducing, or referencing any documents they did not produce and from offering any witness testimony.

### Certification

As set forth above, counsel for the Trustee met and conferred with counsel for the TSI Members on multiple occasions about the Discovery Requests and the deposition of Mr. Acosta and no agreement could be reached.

### Conclusion

The Trustee respectfully requests that the Court prohibit the TSI Members from offering, introducing, or referencing any documents or witness testimony regarding the Abandonment Motion that the TSI Members did not produce in discovery.

Respectfully submitted,

*/s/ Bryan J. Hall*
David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
CHIPMAN BROWN CICERO & COLE, LLP
1313 N. Market Street, Suite 5400
Wilmington, Delaware 19801
(302) 295-0191
carickhoff@chipmanbrown.com
hall@chipmanbrown.com

-and-

Adam D. Cole, Esq. (admitted *pro hac vice*)
CHIPMAN BROWN CICERO & COLE, LLP
420 Lexington Avenue, Suite 442
New York, New York 10170
(646) 685-8363
cole@chipmanbrown.com

*Counsel to the Chapter 7 Trustee*

cc:    Counsel to the TSI Members

9

A054

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | **Re: D.I. 186** |

**ORDER WITH RESPECT TO TRUSTEE'S MOTION TO**
**HOLD DEBTOR IN CONTEMPT**

Upon the Motion of George L. Miller, the chapter 7 trustee (the "Trustee") of the bankruptcy estate ("Estate") of Team Systems International, LLC, for entry of an order finding the Debtor and its members in contempt for violating and continuing to violate the Conversion Order and sanctioning the Debtor and its members for their failure to turnover the Books and Records (the "Motion")[1]; and upon consideration of the Motion and all filings related thereto; and the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and (c) notice of the Motion was due and proper under the circumstances; and (d) after due deliberation, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. Pursuant to Fed. R. Bankr. P. 9001(5)(A), Deborah Evans Mott and Steven Acosta (the "Management Members") are hereby designated to have the duties that the Bankruptcy Code and the Conversion Order [D.I. 151] impose on the Debtor.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Motion.

A055

2.      The Management Members shall immediately comply with all obligations imposed on the Debtor under the Bankruptcy Code and the Conversion Order.  The failure to satisfy these obligations will subject the Management Members to contempt penalties.   The Management Members shall turnover all assets, documents, and other property of the Debtor to the Trustee on or before July 13, 2022 (or, if already produced as Acosta testified at the hearing on the Motion, identify the Bates numbers of the documents), including, without limitation, the following, to the extent they exist:

a)  "Original" documents for all deposits and disbursements from 2017 through 2022 (including correspondence), original documentation of unpaid bills, original documentation for accounts receivables (whether collected or still due and outstanding), original documentation for all distributions to members from 2018 through 2022, and original documentation for all capital contributions including date of all contributions;

b)  The broken computer and all login credentials (including usernames and passwords) and any receipts or documentation regarding Debtor's attempts to fix such computer;

c)  Current draft of the 2020 tax return and supporting schedules, all correspondence with tax lawyer/accountant including any Debtor privileged material but excluding any personal attorney-client privileged material (if any), in which case a privilege log will be provided;

d)  The Debtor's expert report from the Florida litigation against the Debtor in the United States District for the Northern District of Florida, Case No. 18-cv-00442-RH-MAF and all documents provided to such expert;

e)  Copies of Contracts listed on Schedule G of the Debtor's Schedules of Assets and Liabilities [D.I. 28] and all related correspondence, emails or other communications;

f)  Year-end reports for 2017, 2018, 2019, 2020 and 2021 generated by the Debtor's accounting software (Peachtree or any later iteration), and any supporting schedules, and detailed year-to-activity for each of the years requested for each Balance Sheet and Income Statement account by account number;

g)  All other reports generated by the Debtor's accounting software (Peachtree or any later iteration) for 2017 through the Petition Date;

h)  Invoices for all disbursements from 2017 through 2022 (other than Bering Straits);

i)  Schedules supporting 2018 and 2019 tax returns;

j)  Debtor's limited liability agreements in effect from 2017 through the Petition Date (including any amendments);

k)  All disbursement records from 2017 forward including but not limited to bank statements, cancelled checks, payment ledgers, and accounts payable documents;

l)  All correspondence regarding the Debtor's potential claims against FEMA and DHS;

A056

m) All assets purchased with Debtor funds;

n) All receipt records from 2017 forward including but not limited to bank statements, deposit documents, deposit ledgers, and accounts receivable documents.

3.      The members of the Debtor and their affiliates are hereby prohibited from transferring or encumbering the Real Properties for a period of six months from the date upon which this Order is entered without prejudice to the rights of any party to seek to terminate or to extend this prohibition.  To the extent that any party affected by this provision believes that its due process rights were violated with respect to the prohibition, such party may ask the Court for a hearing to address such issues.

4.      Upon the Trustee's receipt of all of the documents and items identified in paragraph 2 above (or an affidavit signed by both Management Members indicating that such documents no longer exist or never existed), the Trustee shall file a notice with the Court confirming his receipt of such documents and items.  Upon the filing of such notice, the prohibitions in paragraph 3 shall be automatically lifted and vacated without further order of the Court.

5.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or enforcement of this Order.

6.      The Motion is otherwise DENIED without prejudice to the Trustee's right to renew it if circumstances warrant.

Dated: July 14th, 2022
Wilmington, Delaware

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

A057

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Team Systems International, LLC,<br><br>            Debtor. | Chapter 7<br><br>Case No. 22-10066 (CTG) |
| George L. Miller, solely in his capacity as the Chapter 7 Trustee of Team Systems International, LLC,<br><br>            Plaintiff,<br><br>-against-<br><br>Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, Addy Road LLC, Brent Road LLC, Benjamin P. Smith, Jessica M. Smith, TSI Gulf Coast, LLC, TSI Education & Training, Inc., and Team Systems International Southeast LLC, and<br><br>John Does 1-100,<br><br>            Defendants. | Adv. Proc. No. 23-50004 (CTG)<br><br>Re: Adv. D.I. 254, 260, 281, 301 |

### ORDER COMPELLING CERTAIN DEFENDANTS TO COMPLY WITH DISCOVERY

Upon consideration of the motion (the "Motion")[1] filed by the Chapter 7 Trustee seeking entry of an order, pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 34 and 37, Fed. R. Bankr. P. 7034 and 7037, and Local Rule 7026-1, compelling defendants Deborah Evans Mott ("Mott"), Steven M. Acosta ("Acosta"), Christopher Mott ("CM"), John S. Maciorowski ("JM" and, collectively,

---

[1] Capitalized terms used but not defined in this Order have the meanings ascribed to such terms in the Motion, in the RFPs, or in the ROGs, as applicable.

with Mott, Acosta and CM, the "Individual Defendants"), Addy Road LLC ("Addy Road" or "Addy"), and Team Systems International Southeast LLC ("TSI Southeast" or "TSI SE" and, collectively, with the Individual Defendants and Addy Road, the "Defendants") to produce documents and things in response to the Trustee's requests for production (collectively, the "RFPs") and to answer interrogatories directed to the Individual Defendants (collectively, the "ROGs"); and upon consideration of the response to the Motion filed by Defendants [Adv. D.I. 260] and the reply in support of the Motion filed by the Trustee [Adv. D.I. 281]; and upon the record of the hearing held on August 8, 2024 (the "Hearing"); and the Court having determined at the Hearing to stay this adversary proceeding as to Mott but not as to any of other Defendant and to direct the Defendants other than Mott to comply with discovery and prior Court orders; and after due deliberation and good and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.	The Motion is granted as set forth herein with respect to the Defendants other than Mott.

2.	By no later than September 16, 2024, each of Acosta, CM, JM, Addy Road, and TSI Southeast shall produce to the Trustee the following:

a.	All bank account statements for accounts maintained by You between January 1, 2018 and the present including, but not limited to, all redacted and unredacted versions of such bank statements.

b.	All Documents concerning Your tax returns for the tax years from 2018 through the Petition Date of January 18, 2022, including, but not limited to, filed tax returns, unfiled tax returns, draft tax returns, communications concerning tax returns and working papers concerning all draft and final versions of tax returns, and all related and similar documents.

c.	All Documents concerning the consideration, value, property, assets and/or services that Debtor Team Systems International, LLC received in connection with the transfers listed in Exhibit A of the First Amended Complaint [Adv. D.I. 37].

A059

d.    All Documents bearing Bates numbers that begin "TSI-" that have not previously been produced to the Trustee, including without limitation, the Documents bearing Bates numbers TSI-004310 through and including TSI-005997, TSI-006000 through and including TSI-006173, and TSI-006194 through and including TSI-006196.

e.    Any and all other Documents or tangible things responsive to the Trustee's RFPs.  For the avoidance of doubt, if any Defendant fails to produce any Documents or tangible things so requested, such Defendant(s) shall be prohibited from introducing or relying upon any such Document(s) or tangible thing(s) in connection with any dispositive motion or trial in this adversary proceeding.

3.    By no later than September 16, 2024, each of Acosta, CM, JM, Addy Road, and TSI Southeast shall answer fully and under oath each of the Trustee's ROGs, unless it is objected to, in which case such Defendant(s) must state the reason for the objection and answer the Interrogatory to the extent that is not objectionable, and the Court will resolve any such objections.

4.    By no later than September 16, 2024, Acosta shall turnover to the Trustee all assets, documents, and other property set forth in the Court's July 14, 2022 *Order with Respect to Trustee's Motion to Hold Debtor in Contempt* [Main Case D.I. 222] (the "July 2022 Order"), including without limitation all Debtor accounting records, bank statements, computer equipment, contracts, corporate records, emails, fuel orders and other records regarding the fuel business, documents regarding the SAM.gov account, and any other Debtor assets, documents or property that have not previously been turned over to the Trustee.  Pursuant to paragraph 4 of the July 2022 Order, to the extent that any such documents or items identified in the July 2022 Order no longer exist or never existed, Acosta shall provide to the Trustee a signed affidavit by no later than September 16, 2024.

5.    Without in any way limiting the preceding paragraph, by no later than September 16, 2024, Acosta shall turn over to the Trustee all "Original" (as defined in the July 2022 Order)

3

bank statements for Debtor bank accounts not previously turned over, including without limitation the following:

a.    the Debtor's bank statement for BBVA account number 6749439759 for the month of February 2020, a copy of which was previously identified as TSI000034;

b.    the Debtor's bank statement for BBVA account number 6769882888 for the month of May 2021, a copy of which was previously identified as TSI000138; and

c.    the Debtor's bank statement for BBVA account number 6769882888 for the month of February 2020, a copy of which was previously identified as TSI000180.

6.    If any of Acosta, CM, JM, Addy Road, or TSI Southeast fails to timely comply with this Order, the Trustee may seek further relief from the Court, including without limitation prohibiting such Defendant from raising defenses for which they have failed to produce or respond, striking such Defendant's answer, making adverse inferences against such Defendant, and/or granting monetary sanctions.

7.    The entry of this Order is without prejudice to the rights of the Trustee to seek discovery from Mott upon the lifting of the stay of this adversary proceeding as to Mott.

8.    The Court retains jurisdiction to interpret and enforce this Order.

**Dated: August 16th, 2024**
**Wilmington, Delaware**

**CRAIG T. GOLDBLATT**
**UNITED STATES BANKRUPTCY JUDGE**

A061

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Chapter 7
                                .  Case No. 22-10066 (CTG)
TEAM SYSTEMS                    .
INTERNATIONAL, LLC,             .
                                .
          Debtor.               .
. . . . . . . . . . . . . . . .
                                .
GEORGE L. MILLER, SOLELY        .  Adversary Proceeding
IN HIS CAPACITY AS THE          .  No. 23-50004 (CTG)
CHAPTER 7 TRUSTEE OF TEAM       .
SYSTEMS INTERNATIONAL, LLC,     .
                                .
          Plaintiff,            .
                                .
     -against-                  .
                                .
DEBORAH EVANS MOTT, STEVEN      .
M. ACOSTA, CHRISTOPHER MOTT,    .
JOHN S. MACIOROWSKI, ADDY       .
ROAD LLC, BRENT ROAD LLC,       .
BENJAMIN P. SMITH, JESSICA      .
M. SMITH, TSI GULF COAST,       .
LLC, TSI EDUCATION &            .
TRAINING, INC., AND TEAM        .
SYSTEMS INTERNATIONAL           .
SOUTHEAST LLC, AND JOHN         .  Courtroom No. 7
DOES 1-100,                     .  824 Market Street
                                .  Wilmington, Delaware 19801
          Defendants.           .
                                .  Friday, January 23, 2026
. . . . . . . . . . . . . . . .    10:00 a.m.

                    TRANSCRIPT OF HEARING
         BEFORE THE HONORABLE CRAIG T. GOLDBLATT
              UNITED STATES BANKRUPTCY JUDGE

                         (Cont'd)

A062

2

APPEARANCES:

For Plaintiff/
Chapter 7 Trustee,
George L. Miller:          Bryan J. Hall, Esquire
                           CHIPMAN BROWN CICERO & COLE, LLP
                           1313 North Market Street
                           Suite 5400
                           Wilmington, Delaware 19801

                           Adam D. Cole, Esquire
                           420 Lexington Avenue
                           Suite 442
                           New York, New York 10170

For Defendants Addy
Road, LLC; Team
Systems International
Southeast, LLC;
Christopher Mott;
Deborah Evans Mott;
John S. Maciorowski;
Steven M. Acosta:          John S. Malik, Esquire
                           JOHN S. MALIK, ATTORNEY-AT-LAW
                           100 East 14th Street
                           Wilmington, Delaware 19801

                           -and-

                           Randy S. Mott, Esquire
                           LAW OFFICE OF RANDY MOTT, ESQUIRE
                           1627 K Street, NW
                           Suite 400
                           Washington, DC 20006


Audio Operator:            Teasha Marsh, ECRO

Transcription Company:     Reliable
                           The Nemours Building
                           1007 N. Orange Street, Suite 110
                           Wilmington, Delaware 19801
                           Telephone: (302)654-8080
                           Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

A063

3

INDEX

MOTIONS:                                                          PAGE

Agenda
Item 2:    Motion of the Owners of Debtor to Compel         6
           Abandonment of Property of the Estate, filed
           on July 15, 2025 [Main Case D.I. 643]

           Court's Ruling:                                  111

Agenda
Item 3:    Chapter 7 Trustee's Motion for Sanctions        112
           Pursuant to Fed. R. Bankr. P. 9011 and 28
           U.S.C. § 1927 Against John S. Malik, Esq. and
           Randy M. Mott, Esq., filed on September 10,
           2025 [Main Case D.I. 650]

           Court's Ruling:

Agenda
Item 4:    Motion to Compel Production of Documents by       75
           Miller Coffey Tate, filed on October 29, 2025
           [Adv. D.I. 443]

           Court's Ruling:                                   82

Agenda
Item 5:    Motion of the Chapter 7 Trustee for Entry of      82
           An Order (I) Enforcing the Preliminary
           Injunction, (II) Lifting the Stay Order, (III)
           Directing Deborah Evans Mott and John S.
           Maciorowski to Show Cause Why They Should Not
           Be Held in Contempt, and (IV) Granting Related
           Relief, filed on December 19, 2025
           [Main Case D.I. 660; Adv. D.I. 450]

           Court's Ruling:                                   110


Transcriptionists' Certificate                              128

A064

4

EXHIBITS

TRUSTEE'S EXHIBITS:                                              PAGE

15 - 19   Five emails                                           53

20 - 32   Emails among Trustee Professionals                    53

33 - 34   Excerpts of Discovery Responses                       54

39 -      Schedules of Assets and Liabilities                   54

42 -      Declaration of Mr. Acosta, D.I. 120                   42

43 -      Hearing transcript, 3/09/22                           55

44 -      Hearing transcript, 3/14/22                           55


DEFENDANTS' EXHIBITS:                                            PAGE

 1 - Interim billing of Archer & Greiner                         8

 2 - Interim billing of Miller Coffey Tate                       9

 3 - Trustee's District Court filing re FEMA appeal              9

 4 - Composite exhibit, multiple documents                      15

 5 - Email from Carickhoff to Munoz                             17

 8 - Previous Acosta testimony                                  19

 9 - Characterization of FEMA claim                             22

10 - Application to retain Venable                              24

12 - Bering Straits' proof of claim                            26

16 - Various exhibits attached to Exhibit 16                    33

19 - Hearing transcript, 6/30/22                                34

22 - Report on FEMA claims                                      39

23 - Trustee's application to employ experts                    40

A065

5

(Proceedings commenced at 10:00 a.m.)

THE CLERK:  All rise.

THE COURT:  Be seated.  Good morning.

MR. HALL:  Good morning, Your Honor.

THE COURT:  We are here in, In re Team Systems International, which is Case Number 22-10066.

Mr. Hall?

MR. HALL:  Good morning, Your Honor.

Bryan Hall of Chipman Brown Cicero & Cole, on behalf of George Miller, the Chapter 7 Trustee.  Your Honor, with me this morning is my colleague Adam Cole.

MR. COLE:  Good morning, Your Honor.

MR. HALL:  We appreciate the Court's time scheduling this hearing today.

Your Honor, we filed an amended a hearing agenda at main case Docket Item 687 and we appreciate the Court granting the motion to seal.

I conferred with Mr. Malik prior to the start of the hearing.  I think that the plan is to take things in order as they are in the agenda, unless Your Honor would prefer to proceed otherwise.

THE COURT:  The only thing that might make sense to get out of the way is there's a motion for leave to file a surreply.  That seems like it ought to be noncontroversial.

Is there any opposition to --

MR. HALL:  No objection to that.

THE COURT:  I've read it, so I'm not sure that opposing it -- there's a lot of margin in opposing it.  So we'll go ahead and grant the motion for leave to file.

If you could upload the order, though -- Mr. Malik, if you could upload the order, you know, pursuant to the Court procedures, we can then go ahead and grant that.

MR. MALIK:  I will, Your Honor.

THE COURT:  Very well, thank you.

Okay.  So, otherwise, I'm happy to proceed in the order of the agenda.

MR. HALL:  All right.  Thank you, Your Honor.

So, yeah, I'm happy to answer any questions, Your Honor.  The first matter that's scheduled as going forward is Item 2 on the agenda, which is the motion of the owners of the debtor to compel abandonment of property, which is at main case, Docket Item 643.

So, with Your Honor's permission, I'll turn the podium over to Mr. Mott to put on his evidence in this case.

THE COURT:  Very well.  Thank you, Mr. Hall.

Mr. Mott?

MR. MOTT:  Good morning, Your Honor.

Randy Mott for the Defendants.  With me is John Malik, my co-counsel.

I guess what we will do is start by looking at our

exhibit list.  I don't believe any of them are controversial and I would just go through them and see if there --

THE COURT:  So --

MR. MOTT:  -- were objections.

THE COURT:  -- have you submitted a binder of exhibits?

MR. MOTT:  Everything has a D.I. number, Your Honor.  We submitted a list.

THE COURT:  Okay.  Very well.  Got it.  Okay.

All right.  Go ahead.

MR. MOTT:  And the Exhibit 1 is the interim billing of Archer & Greiner, D.I. 334.  It was submitted to the Court and certified.  I don't think there's any problem with its admissibility.

MR. COLE:  We object on relevance.

THE COURT:  What's the relevance, Mr. Mott.

MR. MOTT:  Well, I think it would depend on how I would use it or tend to use it.

THE COURT:  Well, if you're moving it into evidence, you need to tell me how you intend to use it.

MR. MOTT:  Okay.  Well, we're using it to show the work that Mr. Carickhoff did on the FEMA account and the tasks performed.

THE COURT:  Mr. Hall?

MR. COLE:  We're here on Section 554(b).  The

movant's burden is to show two things:  either the claim has no value or it's overly burdensome for the estate to pursue. What matters -- what efforts the lawyers did to take a look at the claim, what their thought process was, what they looked at is irrelevant to that we and, therefore, the -- going through fee applications is irrelevant.

THE COURT:  What's your response, sir?

MR. MOTT:  If I may, Your Honor?

THE COURT:  You may.

MR. MOTT:  I agree with Mr. Cole's first part of his analysis.  The only issue is that the trustee determined it has no value, and if so, it falls squarely in 543 and should be abandoned.  The trustee, however, in pleadings has intimated that he was impeded from collecting this and it's some kind of justification for his failure to, you know, proceed with the change order.

THE COURT:  All right.  So, look, there is a back-and-forth in the pleadings about whether you had the opportunity to review materials and this bears on that question, so I'll overrule the objection and admit it without prejudice to anyone's argument about the weight to be afforded.

MR. MOTT:  Okay.

THE COURT:  So the document will be admitted.

(Defendants' Exhibit 1 received into evidence)

MR. MOTT: Yes, we would much prefer to get to the statutory criteria ourselves, but if we are going to -- the Exhibit 2 is a similar thing with the Miller Coffey Tate billings. They describe the valuation of the FEMA claim and documents and we -- and they were certified.

THE COURT: Okay. Any objection?

MR. COLE: Same objection, Your Honor.

THE COURT: Okay. Same ruling.

I'll overrule the objection and enter the document.

(Defendants' Exhibit 2 received into evidence)

MR. MOTT: Okay. And Exhibit 3 is the trustee's filing in U.S. District Court notifying supplemental authorities about the outcome of the appeal of the FEMA cancellation claim at D.I. 528.

THE COURT: Any objection?

MR. COLE: No objection, Your Honor.

THE COURT: That'll be admitted.

(Defendants' Exhibit 3 received into evidence)

MR. MOTT: Then the next exhibit is our -- the exhibit's attached, Number 4 -- the exhibit's attached to our motion for abandonment and reply -- our motion for abandonment at D.I. 643.

THE COURT: Any objection?

MR. HALL: Your Honor, this -- I guess, before I

lodge a formal objection, one of the issues here at Exhibit 4 and elsewhere is it's sort of a composite; it's multiple, different documents and they have different issues.  So, for example, Your Honor, if I look at Exhibit 4, you know, the first item identified as Exhibit 1 behind Exhibit 4 is a letter from the Defense Logistics Agency.  I don't understand the relevance of that since they said that they withdrew the allegations regarding them.

MR. MOTT:  Well, those would be -- yeah, those would be excluded.

THE COURT:  Right.  So, can you say, more specifically, what you're seeking to move into evidence?

MR. MOTT:  Okay.  It would be those documents, excluding the Defense Logistics Agency claims, which were withdrawn, Your Honor.

THE COURT:  All right.  So you're not moving the motion itself; you're moving the exhibits to the motion and among the exhibits, you're not moving Exhibit 1.  So it's Exhibit --

MR. MOTT:  Right --

THE COURT:  Exhibit 2 is a letter from Mr. Hall.

MR. HALL:  I think Exhibit 2 is duplicative of the previously admitted Exhibit 3.

MR. MOTT:  Yes, that's right.

THE COURT:  All right.  So there's no need to

A071

admit that.

So Exhibit 3 is an email exchange; any objection to the admission of that?

MR. HALL:  Yes, Your Honor.  There's --

THE COURT:  It's an email exchange and the attaching materials.

So, go ahead.

MR. HALL:  I apologize, Your Honor.

THE COURT:  No.

MR. HALL:  Yeah, I think there are some issues. First, there are the emails of Mr. Munoz, who's not here.

MR. MOTT:  I might add that's in your exhibit list, as well, the same thing.

MR. HALL:  I'm sorry?

MR. MOTT:  I believe that's on your exhibit list, as well.

MR. HALL:  Not that I'm aware of.  Well, portions of it may be.

But setting aside for the moment, the email, Your Honor, there are other parts of this document.  There's a draft document, claim for logistics plan change.  There's an Excel spreadsheet.  There are what appear to be excerpts from emails from 2017.

The, you know, the speakers on those documents are not here, Your Honor.

MR. MOTT: Yeah, we're not offering the document for the truth of the attachments; only the fact that Mr. Munoz communicated them.

THE COURT: So --

MR. COLE: They still have to authenticate the copy, Your Honor.

MR. MOTT: Well, authenticating the document would be that's his email and email address and it went to parties present.

THE COURT: So let's take this one step -- let's take this one step at a time.

First of all, look, the practice here is not to challenge. You're allowed to do what you want to do -- I'm not stopping you -- but it would surprise me that if I was getting an authenticity objection in the absence of some reason to think the document isn't what it appears to be.

MR. COLE: The issue, Your Honor, is it's the burden of the movant and the movant hasn't brought a witness with him. So, all these documents are just thrown in and now he's going to argue from documents that are not in evidence.

I agree, Your Honor, that that's the practice, but that's what's going on here.

MR. MOTT: Well, they're talking about an email. You neither have to -- you don't necessarily have to have the sender or receiver if there's somebody familiar with the

topic, familiar with the format, familiar with the --

THE COURT:  Who's going to testify as to it?

MR. MOTT:  -- email addresses and --

THE COURT:  And who's going to offer that testimony?

MR. MOTT:  Well, I'm his co-counsel involved at the time and I recognize the format and --

THE COURT:  You're not under oath, so tell me who's going to take the stand and do that.

MR. MOTT:  Well, I'll go under oath for it.

THE COURT:  All right.  I mean, look --

MR. MOTT:  I mean, Mr. Hall submitted a lengthy statement and become a witness, so if I need to be a witness for every email that I've received a copy of from my co-counsel at the time.

MR. COLE:  Mr. Mott is going to get on the stand, testify to an email that he was not a party to, and tell us what it's all about.

THE COURT:  Mr. Mott, you aren't on these emails.

MR. MOTT:  No, but I received it and I recognize Mr. Munoz' email and format and I received it, near contemporaneous with this being sent, and recognize it as a document that was done --

THE COURT:  All right.  Let's break this up.

So, look, I very much want to put substance ahead

of form.  I want to respect procedural rights, but do you have any reason, as you sit here now, to dispute that this document is what it purports to be?

MR. HALL:  Your Honor, if I may --

THE COURT:  Yes.

MR. HALL:  -- just to clarify, that the email exchange between Mr. Munoz and counsel for the trustee is what it purports to be.

THE COURT:  Right.

MR. COLE:  No, but I (inaudible).

THE COURT:  Okay.  All right.

So I think we -- I think that resolves, as to the email, the authenticity question.

MR. COLE:  It's really the attachments.

THE COURT:  So, we can have a conversation, a separate conversation about the attachments.

MR. COLE:  It's not (inaudible).

THE COURT:  And let's talk about what you -- so, when we're referring to the attachments, we're talking about the -- it's a little bit complicated just from looking at the piece of paper, so...

MR. MOTT:  I would, if I can cut this short, Your Honor --

THE COURT:  Yeah, please.

MR. MOTT:  -- and maybe simplify it?

We're not offering the attachments for the truth of the matters contained in there.  There were some issues that would require a witness who is familiar with the document, who compiled it; only that documents were provided.

THE COURT:  So, just to establish the fact that the attachments were provided?

MR. COLE:  Again, it's irrelevant, but okay, I understand what (inaudible).

THE COURT:  All right.  So --

MR. MOTT:  Well, Your Honor, if they're going to withdraw their argument that we failed to cooperate in documenting the claim and that's some defense to our abandonment motion --

THE COURT:  All right.  So, look, I'm going to admit the document -- the Exhibit 3 to the -- for it, so the submission, for the purpose of establishing that particular materials were provided and for no other purpose.

MR. COLE:  Thank you.

(Defendants' Exhibit 4 received into evidence)

THE COURT:  Okay.  Mr. Mott, what's next?

MR. MOTT:  Well, 3 is the critical -- our Exhibit 5 for this hearing is the various pleadings by the trustee on the describing the claims and they -- those -- wait a minute.

MR. COLE:  Judge?

MR. MOTT:  No, it's the pleading -- I'm sorry -- it's 612.  It's their --

MR. COLE:  Oh, wait a minute, what?

THE COURT:  So, let's slow down.

So we're no longer talking about exhibits to Exhibit 4?

MR. MOTT:  No.

THE COURT:  We're now talking about Exhibit 5 on your exhibit list --

MR. MOTT:  Yes.

THE COURT:  -- which is D.I. 612?

MR. MOTT:  Yes.

I'm sorry, I jumped the gun.  That's a trustee pleading, I believe.

THE COURT:  So, what I have under the exhibit list as your Exhibit 5 is, basically, a fragment of D.I. 612-2, which is an email from Mr. Carickhoff to Mr. Munoz.

MR. HALL:  We don't dispute that email.

MR. COLE:  If it's just the email, yeah, we don't have an objection to the email from Mr. Carickhoff to Mr. Munoz --

THE COURT:  Okay.  Is that what you're seeking --

MR. COLE:  -- if that is what it is.

THE COURT:  Mr. Mott, is that what you're seeking to admit?

MR. MOTT:  Yes.

THE COURT:  Okay.  Fine.

So, that will be admitted, to that extent only.

(Defendants' Exhibit 5 received into evidence)

MR. MOTT:  Yes.

THE COURT:  Okay.  What's next, Mr. Mott?

MR. MOTT:  Number 6 is D.I. 616 at 2.  I, again, I won't go into the -- if the AI issue is resolved that arose when these pleadings were done, I won't -- if that's resolved in the opinion of the trustee and the Court, I -- we don't need to worry about that pleading; it may simplify things.

MR. COLE:  I'm not sure why it's in this motion. This is a motion for abandonment under 544(b).

THE COURT:  So, what's the relevance of any AI issue in the motion for abandonment?

MR. MOTT:  Well, in the -- we were accused of -- there was a sanctions motion filed against the debtor.

THE COURT:  I understand that.

That's not -- what's in front of -- what we're now talking about --

MR. MOTT:  All right.  On the merits.

THE COURT:  -- is your abandonment motion.

MR. MOTT:  Okay.  Well, then, we don't need Number 6.  That's fine.

Then, next is Number 7, which is the -- our

withdrawal of a pleading withdrawing the DLA claims; again, I don't think that's controversial or before us now.

THE COURT:  Well, tell me why it's admissible into evidence; it's a pleading.

MR. MOTT:  I don't think it is.  I wanted to --

THE COURT:  Okay.  What we're here for -- what we're now addressing is your motion to admit documents into evidence.

MR. MOTT:  Yes.

THE COURT:  So let's address what you want admitted into --

MR. MOTT:  Okay, yes.

THE COURT:  -- evidence.

MR. MOTT:  Well, they -- it would really go to the sanctions; the sanctions they (indiscernible) again.

THE COURT:  I understand that.

MR. MOTT:  So, it would not be on for this purpose.

THE COURT:  Well, to the extent the sanctions motion is on the agenda, we'll address it, if and when we get to it.

MR. MOTT:  Right.

THE COURT:  But we're now here on, for now --

MR. MOTT:  Yes, that's fine.

THE COURT:  Okay.

MR. MOTT:  Okay.  And Exhibit 8 is previous Acosta testimony, D.I. 507 at page 192.  This deals with what documents he has.

If they're not arguing the issue that they're excused from not pursuing a claim because of lack of discovery or participation by the Defendants, our exhibit is moot.  If they're saying that they didn't have critical documents they needed for --

MR. COLE:  No objection.

THE COURT:  Okay.

MR. MOTT:  Okay.

THE COURT:  It will be admitted.

(Defendants' Exhibit 8 received into evidence)

MR. MOTT:  Okay.  Number 9 is two sets of pleadings in related litigation; excerpts from the U.S. District Court and the Third Circuit involving the Florida claim.

THE COURT:  So, what's the theory -- any objection?

MR. HALL:  Well, Your Honor, so the first part of Exhibit 9 is a document filed in the District Court that appears to be duplicative of the previously admitted Exhibit 3.  It's just referencing the Federal Circuit judgment.

MR. MOTT:  Yes.

THE COURT:  Okay.  Is there anything different about this that adds --

MR. MOTT:  No, that would be fine if it's --

THE COURT:  Okay.  So it will be overruled on the grounds that it's already, the relevant part is already in the record.

MR. MOTT:  Yeah, and the second part is from the appellate brief in the Third Circuit, Case 24-3356; only an excerpt, page 28.

THE COURT:  I'm sorry, Exhibit -- your Exhibit 9, what -- all I have under Exhibit 9 is the notice of supplemental authority that attaches the judgment of the --

MR. MOTT:  If you flip behind it, there's a -- Your Honor, in on our exhibit list there's the -- the notice was in the District Court and in the Court of Appeals there's a characterization on page 28 of their brief of the FEMA claim -- his characterization of the FEMA claim.

THE COURT:  All right.  So that's not in the PDF that I have, but that may just be an uploading error.

MR. HALL:  Your Honor, my -- I'm sorry, Your Honor --

THE COURT:  Go ahead.

MR. HALL:  -- my understanding is that Mr. Mott is referring to a brief that the trustee, as appellee, filed in the Third Circuit in an appeal of Your Honor's order granting

the trustee's settlement with the judgment creditors.

THE COURT:  Okay.

MR. HALL:  So, I'm just not really sure if --

THE COURT:  Yeah --

MR. MOTT:  So, that's accurate.

THE COURT:  Well, I, unfortunately, don't have that, because it's not in the PDF that is -- that I have. That could very well be our mistake -- I don't know -- but tell me what the relevance is.

MR. MOTT:  There's a statement on page 28 by the trustee:

"The likelihood of collecting the $3.6 million FEMA claim, accordingly, does not even rise to the level of remote."

And I believe that's of extreme relevance to the motion.

MR. HALL:  I'm sorry, what?  I don't see that on that page.

MR. MOTT:  Oh, it's right there.

MR. HALL:  It's referring to the $13.6 million FEMA claim.  That's the -- what we referred as the "cancellation claim."

THE COURT:  No, I understand.

And there's a final judgment in there, but it seems -- we can have a conversation about all that --

MR. HALL:  Yeah, I'm not really sure what the brief adds to --

THE COURT:  -- but I'm going to admit it.  I'll let you know that it's not in what was uploaded, so I don't have it.  So, if you could supplement by providing --

MR. MOTT:  Yes, absolutely.

THE COURT:  -- that, that would be great.

MR. MOTT:  Absolutely, Your Honor.  I apologize.

THE COURT:  But based on the description, I'll admit it --

(Defendants' Exhibit 9 received into evidence)

THE COURT:  -- and we'll -- and so what's next?

MR. MOTT:  Okay.  There is -- now, this is another mistake.  I don't think it's controversial as to source, but it should have been listed with these -- D.I. 645.

THE COURT:  All right.  So, which exhibit are we talking about?

MR. MOTT:  It's exhibit -- it would be under the heading "Exhibit 9" but it's D.I. 645, which is a trustee's pleading.

THE COURT:  So, under Exhibit 9 --

MR. COLE:  That's where Exhibit 10 would go.

THE COURT:  Oh, are you -- Mr. Mott, are you on Exhibit 9 or Exhibit 10?

MR. MOTT:  It's Exhibit 9.

MR. COLE:  We just did Exhibit 9.

MR. MOTT:  Yeah, I'm sorry; this should have been with Exhibit 9.  These were statements of the trustee about the claim and pleadings.  They were all the same category and they were lumped together, but apparently this one didn't --

MR. HALL:  So, it's not on the exhibit list?

MR. MOTT:  No.

THE COURT:  All right.  So, look, you should meet and confer and at an appropriate point, we can address that. If it's just a collating error, I'm not going to preclude it, necessarily, so you should have a chance to talk and we can come back to that after you provided copies to everyone, including the Court, because I don't have it either.

MR. MOTT:  Yeah, the issue, I'm afraid, was the person who was compiling our exhibit list had a power outage.

THE COURT:  Look, Mr. Mott, all this work is done by humans; I get it.  I'm not -- I want to not be overly harsh.

MR. MOTT:  Okay.  And the Exhibit 10, D.I. 181, is a transcript at page 14.

MR. COLE:  (Inaudible.)

MR. MOTT:  Page 14, a discussion of the contingency fee.

THE COURT:  So what I have under Exhibit 10, it's a document that is D.I. 181 and it's the application to

retain Venable.

MR. MOTT:  Yes.

THE COURT:  And I don't have a transcript of anything.

MR. MOTT:  Okay.  Just the application, I'm sorry.

THE COURT:  Yep.

MR. MOTT:  Yep.

THE COURT:  Any objection to that?

MR. COLE:  I'm not sure what the relevance of that is, but I would (inaudible).

THE COURT:  What's the relevance?

MR. MOTT:  Relevance is that they had to pay a public contracts expert, employed to collect the claim and it didn't happen, so...

MR. HALL:  I mean, Your Honor, I disagree with Mr. Mott's characterization.  I mean, Venable's retention as special counsel on a contingency-fee basis to pursue a specific claim, which was adjudicated by the Federal Circuit, is a matter of record in this case.

THE COURT:  Okay.  So, therefore, there's no harm in admitting it, right?

MR. HALL:  Yeah, we could do both.

THE COURT:  Okay.  It'll be admitted.

     (Defendants' Exhibit 10 received into evidence)

THE COURT:  I understand your point, Mr. Hall.  We

can argue again about, you know, the specific use, but it seems to me that there's no prejudice to admitting the document and it's arguably relevant.

So, okay.

MR. MOTT:  Okay.  And we'll delete Exhibit 11.

THE COURT:  Okay.

MR. MOTT:  And Exhibit 12 is D.I. 167-5.  This is the contract with Bering Straits under the FEMA order and it involves the -- and it's relevant because it's the task of the subcontractor under that agreement to keep the books and records.

THE COURT:  All right.  So slow down.

So Exhibit 12 is all of D.I. 167, but you're not -- you're saying you don't want to admit all of it; you want to admit only D.I. 167-5, which I'm trying -- and, of course, it's hard to read the docket number because...

But slow down.

MR. HALL:  Your Honor, if I may?

THE COURT:  Yes.

MR. HALL:  It appears that -- and I'm sorry, I'm not sure exactly where -- but I happened to stumble upon a page, PDF page 69 of 75, which identifies 167-5, and this appears to be, at least, a portion of, if not all, of the Bering Straits proof of claim that was filed.  I believe that's on our exhibit list, as well, so --

THE COURT:  I see.  So --

MR. HALL:  -- I mean, the proof of claim is a matter of record.

THE COURT:  If the Bering -- if what you want admitted is -- Mr. Mott, is that right, that what you want admitted is the Bering Straits proof of claim?

MR. MOTT:  Yes.  Yes, that's fine.

THE COURT:  And that's on your exhibit list, as well?

MR. HALL:  Correct.  No objection, Your Honor.

THE COURT:  All right.  So the Bering --

MR. MOTT:  Okay.  So, we've both got it, okay.

THE COURT:  -- Bering Straits' proof of claim will be admitted.

(Defendants' Exhibit 12 received into evidence)

MR. MOTT:  All right.  And Number 13 is the -- I think it's on their list, as well -- it's the notification from Mr. Carickhoff that they're not going to be pursuing the change order --

THE COURT:  So, again --

MR. MOTT:  -- the email notification.

MR. COLE:  No, no, no.

THE COURT:  -- Exhibit 13 is a pleading.

Where in that pleading is the notification that you're describing?

MR. COLE:  I think what Mr. Mott is referring to is the email that's attached, but I think we've already agreed that's --

THE COURT:  Oh, that email has already come in separately.

MR. MOTT:  Okay.  That's fine.

MR. COLE:  That was their previous --

THE COURT:  All right.  Right, okay.

MR. MOTT:  Okay.  We don't need it; we'll just scratch 13, too.

THE COURT:  Okay.  Very well.

MR. MOTT:  That's fine.

And the hiring -- Exhibit 14 is the retention of Venable, D.I. 75-1.

THE COURT:  Just the order that I entered?

MR. MOTT:  Yeah.  Yeah.

THE COURT:  Any objection?

MR. HALL:  Well, Your Honor, just to clarify, the order that's -- that we have, yes, Docket Item 75 is actually an order in the Chapter 11 case on --

THE COURT:  Dealing with ordinary course professionals more broadly.

MR. HALL:  -- ordinary course professionals. Correct.

THE COURT:  Any objection to that becoming into

evidence?

MR. HALL:  Actually, I think the order is on the docket, Your Honor.

THE COURT:  I understand that, but that's not the question now.

Is there any objection to it being admitted into evidence?

MR. HALL:  Well, I want to be careful here, Your Honor, because this was the debtors' motion and order, not the trustee's.

THE COURT:  Well, it's --

MR. HALL:  So, I'd like to be very careful about how these documents are being used, because I think what Mr. Mott is alluding to is Exhibit A to the order, which says:

"Venable, LLP, quote, government contracts counsel."

To be clear, the trustee did not hire Venable as, quote, government contracts counsel; the debtor did.  The trustee's application to employ Venable, I think is Exhibit 10, was admitted; that was for a different purpose.

THE COURT:  Mr. Mott, what is the relevance of an order?

MR. MOTT:  Okay.  I've just asked the paralegal people to give me the things on the retention of Venable.  So

if they're already in on another exhibit, that they were retained, then that's -- then I don't --

THE COURT:  All right.  So, we'll --

MR. MOTT:  -- need this.

THE COURT:  So, we won't admit Exhibit 14.

What's next?

MR. MOTT:  And 15, I am going to voluntarily delete that.

THE COURT:  Okay.

MR. MOTT:  It's about earlier proceedings on the change order.

The abandonment -- Number 16, the abandonment motion reply exhibits, I can go through one by one.  So this is D.I. 647.

Well, 1 is not relevant because it's about the AI and that goes to the sanctions question.

I will pull 2 and 3, as well; they are related to ongoing DLA orders that were proposed to TSI after the -- a post-petition.

I do want to move to enter 647-4, which is Venable's reply to a discovery subpoena indicating there's no responsive document on the contingency fee.

THE COURT:  Any objection?

MR. HALL:  Well, I mean, I'm not sure of the relevance, Your Honor.  The author of the letter, an attorney

at Venable is not here.

I think if Mr. Mott -- because this question has come up before, Your Honor -- if Mr. Mott's specific question is, separate and apart from the retention application on the docket, any order on the docket, is there an agreement between the trustee and Venable, like a, you know, an engagement letter?

THE COURT:  Uh-huh.

MR. HALL:  And there is none, and we have told them that repeatedly.  So that's -- we're not disputing --

MR. MOTT:  Okay.  Then I don't need that.  That's fine, Mr. Hall.  Then, I don't need the dash 4 or dash 5.

THE COURT:  Okay.  Very well.

We'll take the stipulation and we'll -- no need, then, to admit Exhibit 16.

So, what's next?

MR. MOTT:  Okay.  Exhibit 7 is Mr. Carickhoff's form entering the contracts board case.

THE COURT:  Oh, I'm sorry.  So, we're still within Exhibit 16 and you're now on Exhibit 7-2, Exhibit 16.

MR. MOTT:  Yes, 4 -- yeah, 647-7.

THE COURT:  Got it.  So, this is an email or this is a pleading?  I don't know what this is.

What is this?

MR. MOTT:  I think it's his order just showing his

entry into the case as counsel.

MR. COLE:  Mr. Carickhoff filed a notice of appearance in the Contract Board of Appeals as bankruptcy counsel, to describe what was going on in the bankruptcy case --

THE COURT:  Okay.

MR. HALL:  It was for a limited purpose.

MR. COLE:  -- for a limited purpose.  I don't object --  I'm not --

MR. HALL:  That's not disputed.

THE COURT:  Why is that -- how is that relevant?

MR. MOTT:  We think the purpose went beyond his testimony or his comments made to the Court at our last Zoom hearing.

THE COURT:  But just explain to me in English why Mr. Carickhoff's appearance or not in the Contract Board of Appeals is relevant to the question --

MR. MOTT:  It goes to the --

THE COURT:  -- before me today?

MR. MOTT:  -- it goes to their argument that they didn't get all the documents or they need the testimony of Deborah Mott or Steve Acosta, because of the -- their role in the FEMA claims.  And our point is the TSI members were out of the FEMA cancellation order, the one that went to litigation, were out of that in March '22.  And that

everything on that case was done by the trustee and their retained counsel at Venable and an expert they had.

And all the interaction with FEMA and all the compilation of the appendix in this case, it included all the records of what happened --

THE COURT:  All right.  So this document doesn't answer that question.

MR. MOTT:  Yes.

THE COURT:  All this document does is it shows the entry of an appearance.  I'm not sure how relevant that is, but do you dispute -- do you have an issue with the admission into evidence of a document in which the appearance is entered as a matter of public record?

MR. HALL:  We don't dispute that Mr. Carickhoff (inaudible).

THE COURT:  All right.  And that's all this document establishes, right?

MR. HALL:  Yes, Your Honor.

THE COURT:  All right.  Very well.

So I'll admit that document.

MR. MOTT:  And I will delete 8, 9, and 10, and then that takes us through --

MR. COLE:  You need 11; there's an 11 here.

MR. MOTT:  I didn't even have 11 on my list, so, obviously, I don't intend it.

THE COURT: Okay. All right.

So the exhibits attached to Exhibit 16 will be admitted, to the extent described earlier and not to be otherwise.

(Defendants' Exhibit 16 received into evidence)

THE COURT: All right. So what's next?

(Pause)

MR. MOTT: I would, I think that 17, I'm going to drop.

THE COURT: Okay.

MR. MOTT: I believe 18 is already admitted in other exhibits; it's the communication of the trustee about his intent on the claims or describing the claims.

MR. HALL: It's duplicative of Exhibit 3, Your Honor.

MR. MOTT: Yeah.

THE COURT: I understand.

MR. MOTT: June -- Number 19 is the D.I. 224, transcript of the June 30, 2022 hearing, and we would like that admitted, simply as to page 9, which is a characterization by the trustee of the FEMA claims.

THE COURT: Any objection?

MR. COLE: There's no objection, Your Honor.

But I just want to reiterate that the trustee's actions in his business judgment are not relevant in this

A094

case.

THE COURT:  All right.  We'll --

MR. COLE:  But we have no objection to that.

THE COURT:  Okay.  So the -- page 9 of the exhibit that is part of Exhibit 19, will be admitted.  And everyone's rights to argue relevance are reserved.

(Defendants' Exhibit 19 received into evidence)

MR. HALL:  Your Honor, I apologize.

THE COURT:  No.

MR. HALL:  We would request that the transcript come in, in its entirety if it's going to be admitted.

THE COURT:  Okay.  So under the completion of documents --

MR. MOTT:  No objection; that would be fine, Your Honor.

THE COURT:  So the entire transcript will be admitted, very well.

MR. HALL:  Thank you, Your Honor.

THE COURT:  Okay.

MR. MOTT:  Exhibit 20 was the final day of the conversion hearing.  We saw the first part of the conversion hearing as on the trustee's list and we thought, not sure where they're going, but we thought the final day should be on there, as well, if we're going to talk about the conversion hearing.

MR. HALL:  Your Honor, the transcript's a matter of record.  The two, the March 9th and March 14th transcripts that we identified have witness testimony -- prior witness testimony in this case.

My understanding is TSI members Exhibit 20, there's only oral argument and I would just refer to as "housekeeping matters."  So, there isn't actually any testimony identified on that transcript.

MR. MOTT:  I think there's a discussion about the blackouts and discussion with counsel about some of the issues that were raised in the conversion hearing.

THE COURT:  So, if you can identify something that's relevant, I'll hear you.

MR. MOTT:  I believe that was when there was the discussion of Ms. Caisson's blackouts, was on the 16th in the transcript.

THE COURT:  So, what does that have to do with the abandonment motion?

MR. MOTT:  Well, I'm -- we didn't know what they were going to do with the first two days, whether they were going to use anything about blackouts and so --

THE COURT:  You're welcome to object to anything on their list, but I don't -- I don't understand the relevance of --

MR. MOTT:  Okay.  If -- I guess, Your Honor, if it

comes up, I guess we could try to use it as impeachment and --

THE COURT: Right.

MR. MOTT: -- it would probably be admissible for that purpose.

THE COURT: What we're dealing with now is your affirmative case.

MR. MOTT: Yeah, I understand. That's fine. That's fine.

Then Number 21 is -- no, I will pull 21.

THE COURT: Okay.

MR. MOTT: And I think that 22, similarly -- I'm sorry, (indiscernible) out a page -- let's see, in Number 22, it's 683-6 is a report on the FEMA claims, which we believe would be relevant.

THE COURT: So, this is the Washburn report; is that right?

MR. MOTT: Yes, yes.

THE COURT: Mr. Cole?

MR. COLE: We object --

THE COURT: Okay.

MR. COLE: -- on the grounds that if he wants it -- if the Team Systems' members want to put on expert testimony, they should bring in an expert to opine on the claims.

This is, not only hearsay, but it's just not authenticated and it came -- it's not even -- you know, I don't even know what it is, for purposes of evidence.

THE COURT:  Okay.  So what's your response to that?

MR. MOTT:  My response is, it's part of the trustee's deliberation and consideration of the FEMA claims and we think that's relevant to the motion about whether we need to abandon --

THE COURT:  So, what do I know about whose document this is from -- just from looking at it.  I mean how I do -- I mean --

MR. MALIK:  Yeah, they're correct.  There should be -- yeah, I -- yes, there's got to be a prelude to it, but it is the trustee's expert.

MR. HALL:  But I -- it --

MR. MALIK:  I really don't care at this point.  We can scratch it.

THE COURT:  Okay.  All right.  Very well.

So what's next?

MR. HALL:  Oh, the Washburn report and the text stub that my co-counsel points out, says he was engaged by the trustee.  So I think in light of that, we'd still like to keep it in.

THE COURT:  So, why isn't this a statement of a

party-opponent, then?

MR. COLE:  Because it's an expert --
(indiscernible) -- it's an expert witness; it's not the
statement of a party-opponent.

If counsel is saying that the trustee had it, if
that's what he's using it for, to theoretically opine on,
make a decision as to whether or not to bring a claim; I
agree that, for that purpose, it's fine.

THE COURT:  All right.  So you acknowledge the
admissibility of the document basically for the purpose of
establishing that the trustee retained an expert who
generated this report, but not for the truth of the
assertions in the report?

MR. HALL:  Your Honor, I apologize -- this is
Bryan Hall -- neither Mr. Cole, nor I were actually involved
in this specific part of the case, so I can't be sure.

I do know -- I think, I believe what Mr. Malik may
have been pointing to, it does say that it was re-asked by
the U.S. Trustee for Team Systems International.  I assume
that that's a typo and it's referring to the Chapter 7
Trustee.

MR. MALIK:  I think that's correct.

MR. HALL:  So, that's what the document purports
to say.

My general recollection is that the trustee -- and

I think we're going to get to the next exhibit -- I think the trustee did retain some folks that were possibly recommended by the TSI members in the civilian Board of Contract Appeals appeal.

THE COURT:  Uh-huh.

MR. HALL:  So I don't think that's disputed and if that's -- you know, again, as Mr. Cole said --

THE COURT:  And, Mr. Mott, are you asking for the submission for any purpose --

MR. MOTT:  No, of course.  No, only that the fact that there was an expert retained.

MR. HALL:  (Inaudible) appeal.

MR. MOTT:  Obviously, the substance of what he's doing would require him to be here and talk about it.

THE COURT:  Right.  Okay.  Very well.

Okay.  So, it'll be admitted for that limited purpose.

(Defendants' Exhibit 22 received into evidence)

MR. MOTT:  Yeah, and that's the similar purpose for 23, Your Honor, which Mr. Hall kind of jumped the gun on. It's just the D.I. 244, which is the trustee's application to employ experts.

MR. HALL:  And no objection, Your Honor, for that purpose.

THE COURT:  Okay.  Very well.

It'll be admitted for that purpose.

(Defendants' Exhibit 23 received into evidence)

MR. MOTT:  And 398 is the trustee's withdrawal to object to the Bering Straits claim.  It is relevant because the Bering Straits claim contains the calculations for the cost related to the FEMA contract and those costs are the key element in the change order.  So the Bering Straits' records and their claim have a bearing on the cost of the numbers in the change order and that's the only reason that's --

THE COURT:  Any objection?

MR. HALL:  But, Your Honor, if I could, perhaps, take Exhibits 24, 25, and 26 together?

These appear to relate to an issue Your Honor already decided earlier in the case, when the Chipman Brown Law Firm sought to be retained as counsel to the trustee. And Your Honor already decided that issue and there's already an order on that.

THE COURT:  So, slow down.

MR. MOTT:  Can I explain the relevance?

THE COURT:  So, let me take this one bit, one piece at a time.  So the point that Mr. Mott just made is that you withdrew an objection to the proof of claim.  Forget the conflict issue, which he didn't raise at all yet.  He says the withdrawal of the objection to the proof of claim is, it essentially supports the view that the assertions made

A101

in the proof of claim are factual and he thinks that supports his argument about the change order, and so just for that purpose.

MR. MOTT:  Maybe, perhaps not.

We are not asserting today that we can establish these claims are very valuable and we're not fighting the notion that at the current stage of the claims, there's, obviously, difficulties in collecting them and the trustee has been unable to do so.  We are sticking, strictly, to the statutory criteria of the trustee's determination that the cost of the claims would exceed the value that could return on the investment.

THE COURT:  Okay.  So, holding aside the conflict issue, which I don't think is presented by the motion to admit Exhibit 24; simply, the statement by the trustee that it was withdrawing its objection to the Bering Straits' proof of claim, what's the objection to that coming into evidence?

MR. COLE:  If I'm understanding him correctly, Mr. Mott is saying that the amount of the claim is not inconsequential and he's using this as proof that it's not inconsequential, thereby, eliminating the first basis for --

MR. MOTT:  No.

THE COURT:  So, let me just ask you this question: Do you -- all right.  So explain to me the --

MR. MOTT:  Okay.  It's a very serious matter and I

wanted --

THE COURT:  All right.

MR. MOTT:  -- to get into it.

THE COURT:  Okay.

MR. MOTT:  And I had hoped that Mr. Carickhoff would be here to testify.

Chipman Brown drafted the Bering Straits claim that was submitted to the Court.  That claim includes double-billing, which we pointed out in our objection to the claim.  Double-billing violates the False Claims Act.  It also may be, likely, bankruptcy fraud.

THE COURT:  Okay.  What does this have to do with your abandonment motion?

MR. MOTT:  Excuse me?

THE COURT:  What does that have to do with your abandonment motion?

MR. MOTT:  What it does to our abandonment motion is the reason, one reason that the trustee was unwilling to file the change order claim with FEMA was because it would have exposed the Bering Straits' numbers and calculations, which revealed the false claims.

MR. COLE:  I thought --

THE COURT:  What -- go ahead.

MR. COLE:  I thought the purpose of bringing it in was to show what the value of the claim was?

A103

MR. MOTT:  No.

THE COURT:  Okay.  So if it's not to show what the value of the claim is, explain to me how what you just said ties to any of the elements to establish abandonment.

MR. MOTT:  Again, we are looking at the trustee's long list of excuses about why he didn't file the claim and blaming other people and why he couldn't collect it.  And this may explain why, particularly, the trustee in the setting we're in couldn't collect the claim because he had a problem of having the same law firm drafted the claim for the logistics calculations, which included double-billing.

And any submission of that Bering Straits' claim to the Federal Government --

THE COURT:  All right.  So I'm going to reserve judgment on this question until we hear something further that will help me --

MR. MOTT:  That's fine.

THE COURT:  -- understand the relevance.

MR. MOTT:  I think I had hoped that Mr. Carickhoff would be on the stand to discuss those issues, but...

THE COURT:  Did you serve a subpoena on him?

MR. MOTT:  We -- he, is what the process server calls, was an "avoider"; not at home or not at work or, perhaps, Mr. Malik could describe our efforts, but we were unable to serve him.

And that is our list, Your Honor.

THE COURT:  Okay.  All right.

So, I think that we'll come back to 24 if and when I understand more about that.  And so, any further evidence, Mr. Mott, supporting your motion?

(Pause)

MR. MOTT:  No, we're -- that concludes our -- we had hoped to admit testimony of Mr. Carickhoff.  In his absence, I might have some questions for Mr. Cole -- Mr. Hall, but I'm not sure that -- I don't know if the Court would allow me the indulgence to put him on in lieu of Mr. Carickhoff on some of the similar questions.

MR. COLE:  I don't think Mr. Hall is on the witness list, but...

MR. HALL:  Well, I'd actually like to clarify, Your Honor, because I believe the defense -- I see it's identified as Defendants' witnesses -- excuse me.  It looks like they copied the language from the trustee's exhibit list.

I'm identified as a witness, Your Honor, on two issues:  a declaration and a supplemental declaration on D.I. 660, which is the injunction motion.  And we can get to that later, but...

THE COURT:  So, tell me what type of testimony --

MR. MOTT:  Yes.

THE COURT:  -- you would intend to elicit, so I can decide whether it's relevant.

MR. MOTT:  I am very concerned, Your Honor, that underlying this whole issue of the change order, there is a federal crime of double-billing.  I'm very concerned this my client was unable to get the documents from Bering Straits to file the change order until just late July before the petition was filed for Chapter 11.  And then, when we examined them, because they were clearly double-billing, the price of the water included the first leg of the transportation, explicitly in the contract, and then they -- then, Bering Straits added that as a separate element in the transportation bill.  And that was submitted as part of their proof of claim to the Court.

And, in turn, part of those transportation costs is the added cost of the change order was making it go in shipping containers, instead of drop-off pallets.  And the shipping containers Bering Straits had calculated the cost of what those were and that was the cost delta of the change order.  So the change order is all wrapped up in Bering Straits' cost calculations that includes this underlying double-billing.

And we just want to get in the record that fact and the fact that it seems like the law firm --

THE COURT:  So slow down --

MR. MOTT: -- may have had a very specific conflict with this lingering claim, which, by the time they had --

THE COURT: So, Mr. Mott, I just need you to slow down a minute here --

MR. MOTT: Okay.

THE COURT: -- because I have lived with this case a long time, but it's been a long time.

So the debtor, prepetition, was a government contractor. It contracted to deliver water bottles, you know, in response to the hurricane. It was a party to a contract with FEMA.

It subcontracted with Bering Straits; is that right?

MR. MOTT: Yes.

THE COURT: And Bering Straits provided --

MR. MOTT: The transportation.

THE COURT: -- the transportation, okay.

And in the underlying Florida Federal Court litigation was the Bering Straits -- were the costs borne --

MR. MOTT: It was never raised -- this part was not raised in Florida.

THE COURT: So, it has nothing to do with the Florida litigation?

MR. MOTT: Yes.

A107

THE COURT:  Okay.  So Bering Straits, I want to understand what you're alleging.  You're alleging that Bering Straits double-billed the debtor for costs that it didn't actually incur?

MR. MOTT:  Yes.

THE COURT:  Okay.  Let's just play this out and assume that that's true.

If that's true, and did the Debtor, in turn, collect those amounts from FEMA?

(No verbal response)

THE COURT:  You're nodding, but you're not speaking.

MR. MOTT:  Oh, if they did -- I'm just following you, nodding; I'm sorry, Your Honor.

THE COURT:  No, did -- I'm asking, did the debtor?

MR. MOTT:  If it did, it would also be submitting a false claim.

THE COURT:  No, my question -- I'm asking you, did they?

MR. MOTT:  They did not.

THE COURT:  They did not.

MR. MOTT:  That was the change order that was not submitted.

THE COURT:  So, explain this to me again in baby steps.  I apologize.  So, they submitted a bill that did not

A108

include the alleged double billing.

MR. MOTT:  It was for other items, yes.

THE COURT:  Okay.

MR. MOTT:  The double billing -- well, the original bill, the cost of water, included the transport. So, that cost was submitted and paid by FEMA already.  So, the transport cost, since it was included in the volume per liter, was submitted and paid by FEMA.  The second bill, where they add that transportation leg to the additional leg that involved in the change order, they stuck it in again a second time in the bill.

THE COURT:  Okay.  Did the debtor seek reimbursement from FEMA for that?

MR. MOTT:  No, that's the change order.  In looking at the change order for the legitimate part of that second leg of the transportation with containers is the change order.  Wrapped up in that was the --

THE COURT:  I see.  So, you're saying there was a legitimate change order that has real value but that submitting it would require documentation that would reveal double billing and that --

MR. MOTT:  I'm saying that the trustee's counsel --

THE COURT:  -- the reason -- I just want to understand your position.

MR. MOTT:  -- had a conflict on the issue.

THE COURT:  Because they weren't making an honest decision about whether to submit the change order because doing so would reveal that the trustee's other client double billed.  That is your position.

MR. MOTT:  That is our suspicion. I think it would have been better to have Mr. Carickhoff here to address it.

Now, let me be very clear on the value.  It may well be that the statute of limitations for the change order has expired.  The cancellation claim is denied by a Federal Court of Appeals.  We would like to, on our initiative, the members retain specialized DC counsel and see if there are other ways to still collect it.  We're not willing to say that it has no value; however, for purposes of the trustee in this case I think it's already clear they have expended substantial resources and there's no -- and have drawn the conclusion that it would not be --

THE COURT:  Mr. Mott, the elements of abandonment are that the trustee has determined that the asset has no value or is burdensome.

MR. MOTT:  Yes.

THE COURT:  I've got to say, I don't see -- I understand you may or may not -- without passing judgment on whether you have got a legitimate issue with the trustee's judgment not to pursue the change order I'm not sure bears on

your abandonment motion.

MR. MOTT:  It may not.

THE COURT:  Okay.  So, I'm going to --

MR. MOTT:  That's fine.

THE COURT:  -- preclude the calling of a witness just because I don't want to --

MR. MOTT:  I understand that ruling completely, Your Honor.

THE COURT:  Okay, very well.

MR. MOTT:  Our position really goes back, ultimately, to the trustee's determination that these things, he calls them, you know, "speculative," "dubious," "farther remote."  He's already made a decision.  I mean, multiple --

THE COURT:  I understand.  He's the trustee and, you know, abandonment isn't a motion to say he should be replaced as trustee.

MR. MOTT:  Absolutely.

THE COURT:  So, I want to just --

MR. MOTT:  At this point we're taking his decision on its value, face value, and we're just pointing out he's done this after having bankruptcy counsel contact experts, and he says they're worthless.

THE COURT:  All right.  So, let's go back to where we were, which is you have admitted your documentary evidence.  We have concluded that you're not going to call

A111

Mr. Hall.  Mr. Carickhoff isn't here.  In terms of your evidentiary case, is there anything further?

MR. MOTT:  No, Your Honor.

THE COURT:  Okay, very well.  So, why don't we see if the trustee has evidence it wants to admit.

MR. HALL:  May we have just a moment, Your Honor?

THE COURT:  You may. It is now five to 11.  Do you want 10 minutes?

MR. HALL:  Appreciate that, Your Honor.  Thank you.

THE COURT:  Very well.  We will go into recess. It is now five to 11.  I will come back on at 11:05.  Until then, we're in recess.  Thank you.

MR. HALL:  Thank you.

(Recess taken at 10:54 a.m.)

(Proceedings resumed at 11:05 a.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

Mr. Hall.

MR. HALL:  Good morning, again, Your Honor.  Bryan Hall for the trustee.

Does Your Honor have the trustee's exhibit list, which was filed at Docket Item 681?

THE COURT:  I certainly have access to it.  Is this the front of your binder?

A112

MR. HALL:  What's that?

THE COURT:  The front of your binder?

MR. HALL:  It should be, Your Honor.  I have a copy if --

THE COURT:  No, I've got it.

MR. HALL:  Okay.  Thank you, Your Honor.

So, the specific documents -- so, there are a number of documents here but I want to try to organize them if I can, Your Honor.

THE COURT:  Okay.

MR. HALL:  So, starting with Tab 15 of the binder, and this will be, to sort of expedite things, 15 through 19 are five emails obtained from the debtors emails, to the extent that we got them from third party discovery in -- I believe it was sometime in 2024, access by myself.  These specific emails, Your Honor, each of which predates the purported unilateral modification of the contract by FEMA to talk about shipping water by containers, including statements by the opposing party about shipping water in containers to Puerto Rico.

THE COURT:  Any objection to the admission of Exhibit 15 through 19?

MR. MOTT:  No, Your Honor.

THE COURT:  Okay.  So Exhibits 15 through 19 will be admitted.

A113

53

(Trustee Exhibits 15 through 19 received into evidence)

MR. HALL:  Thank you, Your Honor.

So, Your Honor, Exhibits 20 through 32 are emails among the trustee's professionals, specifically myself, Mr. Carickhoff, and Mr. Homony, and either Mr. Acosta, one of the movants, or one of the movant's former counsel.  So, for example, Mr. Rosner, Mr. Munoz -- excuse me, Mr. Roglace (phonetic).  The purpose of these emails, Your Honor, they would be offered to show that the trustee was asking for documents, asking for meetings.

THE COURT:  Any objection to the admission of those documents?

MR. MOTT:  No, Your Honor.

THE COURT:  Okay, they will be admitted.

(Trustee Exhibits 20 through 32 received into evidence)

MR. HALL:  Thank you, Your Honor.

Your Honor, Exhibits 33 and 34 are excerpts -- and, I believe, we have complete copies in case there is any question but these are excerpts of discovery responses, discovery in the adversary proceeding, in which we had asked Ms. Mott and Mr. Acosta, two of the movants, for certain documents related to FEMA and their responses.

THE COURT:  Any objection?

MR. MOTT:  No, Your Honor.

THE COURT:  Okay, they will be admitted.

A114

(Trustee Exhibits 33 and 34 received into evidence)

MR. HALL:  Thank you, Your Honor.

Just one moment, Your Honor.

THE COURT:  Yes.

(Pause)

MR. HALL:  Your Honor, thank you for that time. Exhibit 39 in the binder -- excuse me, Tab 39 in the binder is the statement -- excuse me, schedules of assets and liabilities for non-individual debtors filed at Docket Item 28 in the main case.

THE COURT:  Any objection?

MR. MOTT:  I'm sorry, (indiscernible).

MR. HALL:  Oh, of course. Its Tab 39, schedules of assets and liabilities.

MR. MOTT:  No objection.

MR. HALL:  Thank you.

THE COURT:  That will be admitted.

(Trustee Exhibit 39 received into evidence)

MR. HALL:  Your Honor, Tab 42 is a declaration of Mr. Acosta previously filed in the main case at Docket Item 120.

THE COURT:  Any objection?

MR. MOTT:  No, Your Honor.

THE COURT:  Okay, that will be admitted.

(Trustee Exhibit 42 received into evidence)

A115

MR. HALL:  Your Honor, Tab 43 is the transcript of the hearing Your Honor held on March 9th, 2022.  This was part of the conversion hearing.

THE COURT:  Any objection?

MR. MOTT:  No.

THE COURT:  Okay, that will be admitted.

(Trustee Exhibit 43 received into evidence)

MR. HALL:  Your Honor, lastly on this issue Tab 44 is the transcript of the continuing hearing which was held on March 14th, 2022.

THE COURT:  Any objection?

MR. MOTT:  Could -- I guess as to each of those, if I could ask the relevance because it's about the conversion and there I -- are there pages that are relevant?

MR. HALL:  That is fair.  It's only the portions of these transcripts specific to the FEMA claims.  There was testimony at the conversion hearing related to the FEMA claims.

MR. MOTT:  No objection.

THE COURT:  So, for both of those hearings I will admit the portion of the testimony that bears on the FEMA claims.

(Trustee Exhibit 44 received into evidence)

MR. HALL:  Your Honor, I wanted to note, we had subpoenaed two of the movants, Ms. Mott and Mr. Acosta, to

appear.  I will note that they filed a motion to quash at Docket Item 683. I believe they asserted the Fifth Amendment, among other things, and I will acknowledge that they are not here.

THE COURT:  Okay.

MR. HALL:  So, we will not be calling them at this point.

THE COURT:  Okay.

MR. COLE:  Although, we would have.

THE COURT:  Okay.

MR. HALL:  So, that concludes the trustee's submission of evidence on this motion.

THE COURT:  All right.  So, is there anything to do before we turn to argument on the motion?

MR. HALL:  Nothing from the trustee, Your Honor.

THE COURT:  Okay, very well.

Mr. Mott.

MR. MOTT:  Unfortunately, my client, the equity owners of Team Systems International, have to take these claims as they lie now.  And at this point, while not technically relevant to the statutory criteria, we have some hopes that by working with some experts, we have found other ways to get at these claims.

THE COURT:  So, Mr. Mott, can I ask you this question.

A117

MR. MOTT: Yeah.

THE COURT: So, these are my words not the trustee's but I think if I understand where the trustee is coming from, and I may misunderstand it so don't hold this to them, I think they're saying, look, we're not really the party in the best position to understand whether there is value in these things or not. They are, "they" meaning your clients. To the extent there is value in them, however, that belongs to the estate.

So, if there is value here, we want to capture it and we need you to meet your duties to help us do that. And there is an element of just not wanting to look like an idiot, which is what would be really lopsided would be if your -- and I'm not making a finding but from their perspective, if it turned out they, essentially, allowed your clients not to cooperate, deprive the estate of the value, then the assets were abandoned and you got value, they would then have fallen down on their job to maximize value for the benefit of the estate.

MR. MOTT: That's a theory.

THE COURT: Right. So, help me with that.

MR. MOTT: Yes.

THE COURT: I understand the parties don't like each other and that complicates things.

MR. MOTT: Let me address the issue of the degree

of cooperation and whatever the disputes were have any relevance to their argument that they couldn't fairly, you know, collect it.  There are two elements, as we briefed. There are two elements in the federal contract, very much like there are any other, offer and acceptance. The federal government is very much a stickler even in emergencies to have everything papered.  And there is an SF-30 Form that is filled out and there has to be a written -- some evidence the government was on notice, what the extra costs were and how it acted.  That particular element, whether there's a value here in either claim, is completely bound up in the exchange with FEMA, with the FEMA documents; all of which were produced.

I have done some government contracts work. I really struggle to even contemplate a case where parol oral evidence was used in a decisive way to modify all the paperwork that is required in a government contract. Everything has to be papered.  So, to the extent they have all the paper we have, they had all access.

In the case of the cancellation claim they put all the paper together with the government's counsel in the appeal.  We had -- we completely lost control of that.  That was all -- everything that transpired between FEMA and the contractor was in writing and was laid out in the record. They put the record together.  They were working with FEMA.

If there was a gap in the record they would have, presumably, asked FEMA to fill in the gap.  At that point FEMA had control of all the communications.  As to the costs, all the costs are submitted -- also required to be submitted to FEMA for a claim, and there were costs in the documents and those were submitted.

As to the change order, the costs become much more important but, again, all the discussion of the change order is described in the emails that Mr. Hall mentioned about whether were containers discussed before.  We have attached two emails, which we cannot get the attachments in but there were communications to FEMA about using containers and did that establish a contract or not.  Well, that is all in the documents.

Debbie Mott or certainly Steve Acosta, is not the person that communicated with FEMA, have no testimony that would make that claim good, bad or ugly if it's not in the documents.  It is in the communication between the parties, was there an agreement or not and what did the documents say.

The second element of that is if there was an agreement to shift to containers and that was the change, what is the cost related to that.  Was there actually a cost incurred.  Well, the best party to talk about that is the party that incurred the cost, Bering Straits.  They were responsible for keeping all the records on what happened with

A120

the logistics and any change in what containers cost and then they pass those onto the prime that submits them to the government for reimbursement.

So, on this issue about their failure to testify is completely irrelevant.  The chances would be way beyond remote if I was relying on parol evidence to try to create a contract, you know, in these cases that was not documented already by all the paperwork.

THE COURT:  So, your position is cooperation isn't a thing, that there either is paper or there isn't paper, and if there is they have it and if there isn't then getting your clients cooperation shouldn't make a whit of difference.

MR. MOTT:  Exactly.

THE COURT:  That is your position.

MR. MOTT:  I could have sworn affidavits from my clients and we could put them here and cross-examine all afternoon, you know, is this a real claim.  Yeah, we like the claim.  Well, it goes back to the paper, what did FEMA say, what did they agree to, when did you agree to it, was there added cost, what was it.

THE COURT:  Apologies if I should know this from having studied the record more carefully then I have but was there a point in which you, essentially, offered to pursue this on behalf of the estate as opposed to on behalf of --

MR. MOTT:  Yes.  And they offered to do it and

give a percent to the estate.  We were in negotiations about whether if we --

THE COURT:  But you never said we will do this. Essentially, we will seek derivative standing to act on behalf of the estate so the estate gets whatever we recover.

MR. MOTT:  I don't think -- I was not involved in the earlier -- Mr. Rosner's discussions about the change, Your Honor.  So, I don't know where those discussions were personally.

THE COURT:  Okay.

MR. MOTT:  As to the cancellation order, that is really kind of moot. I think there are really two different distinct --

THE COURT:  So, let's slow down. Let's talk about the cancellation order.  So, we all agree the cancellation order -- this is like really angels dancing on the head of a pin problem, from my perspective. It seems like we all agree that the cancellation order is the subject of a final non-appealable judgement from the federal circuit, right?

MR. MOTT:  Yes.

THE COURT:  So, I am just a lawyer but from what I know about the law that means that determination is final and preclusive and no one can sue the government anymore to recover for that.  Do you disagree with that?

MR. MOTT:  Yeah, that order is final. The time for

appealing that or getting --

THE COURT: So, on the one hand, I understand your view that maybe that establishes that there is no value for the estate but on the other hand it raises the question whether I have a concrete dispute because to the extent you are asking for something and the premise of it is giving me relief gives me nothing then I have got a, sort of, paradigmatic sort of standing question.

MR. MOTT: Well, I'm speculating but a common technique for someone who loses in court but feels its unjust for victim's compensation I think sometimes is a special appropriation from Congress, for example, saying, you know, there are other sort of non-judicial ways that something might be --

THE COURT: Yeah, anyone can show up on Capitol Hill with their handout and say can I have money, please.

MR. MOTT: That's right.

THE COURT: But if there is money here -- if there is an ability to do that on account of what happened to the debtor, why shouldn't that go to the estate. Why should that go to your clients? I mean, your clients are estopped on their own behalf from showing up on Capitol Hill saying, please, give me money.

MR. MOTT: Under your formulation, Your Honor, there would never be an abandonment --

A123

THE COURT:  No, that is not true.  I --

MR. MOTT:  -- because every --

THE COURT:  -- enter orders approving abandonment every day -- not every day.

MR. MOTT:  -- abandonment would have, if there was some notion of value then the trustee would be required to keep doing it.

THE COURT:  The way I understand abandonment -- there are abandonments all the time when trustees reach the judgment that something is of inconsequential value or is burdensome to the estate.  There is a concept of compelled abandonment, I agree.  And the circumstances for that are pretty narrow but, presumably, its -- well, we can talk more.

Let me ask you this: On your understanding of the case law, what are the circumstances, real world circumstances, in which a court compels a trustee to abandon an asset that the trustee hasn't voluntarily just chosen to abandon?

MR. MOTT:  I think if the criteria is met that it is an undue burden on the estate or the cost of dealing with it is greater than the value to the estate, its obligatory for the trustee to abandon it.

THE COURT:  So, if the trustee is busy maintaining an asset wasting value, a creditor can come in and say you're depleting my recoveries this way, stop it, you must -- you

64

need to stop paying, you know, the garage costs for that car because what you're paying for the garaging it is costing more than the value of the car, I will prove that to the judge, just abandon the car, right.  So, that is a thing but that doesn't fit into that rubric.

MR. MOTT:  I think it's also -- well, there is an issue here, in a way the longer these claims lay dormant in their current state the more remote their chance of ever resulting in any value increases.  So, if its determined at this state that they have no value, their chances are more than remote, it would seem to me to be an equity then that doesn't have a plan to do anymore, there is not an obvious way.

If the members want to spend time and effort trying to get some value out of the claims that is a different issue.  That would be their resources, not the estates resources used to do that. I think he has made a decision that he doesn't want to use estate resources to go further.

I am no genie, so I really don't have a magic solution to collect the money but we just think that in the current posture nothing is happening at all and, effectively, for all the characterizations of the claims is, essentially, virtually worthless by the trustee. If there is any chance we should be allowed to consider how much of our resources the

A125

members would want to put into trying to do some more with it.  Since we're playing on our ticket and not the trustee's, not the estate's tab, I think that will be relieving the burden of the estate.

THE COURT:  I understand your position.

MR. MOTT:  That is what I have.

THE COURT:  Okay.  Let me hear from counsel for the trustee.

MR. HALL:  Thank you, Your Honor.  Bryan Hall for the Chapter 7 Trustee.

I would like to respond to the points that counsel made but I think if we kind of first take a step back, look at the statutory language, right, it states under 544(b) that the Court may order the trustee to abandon property of the estate and it has to be burdensome to the estate or of inconsequential value.

I think when it comes to the cancellation claim that Your Honor was mentioning angels on the head of a pin, I think there has been no evidence that there is property of the estate.  So, there really is nothing to be abandoned.

In terms of the --

THE COURT:  So, let me stop you there. If they were to show up on Capitol Hill and say, please, pay me on account of what the estate or the debtor did, would that violate the automatic stay, in your view, as an attempt to

A126

exercise control over property of the estate?

MR. HALL:  So, I think we have to be careful here, Your Honor.

THE COURT:  I thought that would be your answer.

MR. HALL:  So, let's start with some basic premises, and I have copies in case anyone has questions.

The first is, sort of, a black letter question of Delaware law.  The debtor is a Delaware LLC.  Delaware law states that a member has no interest in specific limited liability company property.

THE COURT:  Right. It's the debtors asset, not theirs.

MR. HALL:  It's the debtors asset.

THE COURT:  I agree.  That is why -- that is what brings us here.

MR. HALL:  Exactly, Your Honor.  The debtor is the "contractor" and the -- if there is $13.5 million claim my understanding is only the contactor can bring that claim.

THE COURT:  I understand.  His point is the contractor is choosing not to for reasons maybe good, maybe bad.  I mean for the claim that has -- with respect to final judgment, I understand that.

What he is saying is, look, maybe we have, in our bag of tricks, an ability to find value in it and you have chosen not to, so why shouldn't we be permitted to go to find

value in it.  I understand that.

I think my question to Mr. Mott captured, at least, what -- not to speak for you but what feels to me like a trustee's commonsense response to that which is if there is value here its mine, not yours.  So, if you are going to do that you are going to do that as an agreement with me, not for your own benefit.  I, at some level, understand that.

Is there anything beyond that to what you're saying?

MR. HALL:  Yeah. I mean, we've asked -- you know, the documents that have now been admitted into evidence reflect that the trustee asked multiple times to sit down and speak with the TSI members so if they believe that there is a way to lobby Congress or some other way on behalf of the debtor let's just have a conversation about that and then the trustee can make a determination.

THE COURT:  Okay.

MR. HALL:  I don't think that that warrants abandonment under these facts.  So, in terms of the, what is referred to as, change order claim, obviously, Your Honor has heard quite a bit about that claim previously in the case, testimony during the Chapter 11 that it was going to be pursued imminently this week, next week, and we've admitted Exhibits 20 through 32 which are the trustee's -- which are emails between the trustee's team and the TSI members team

68

between 2022 and 2025.  We can roll forward, as Your Honor will recall, the hearing that we had last Thursday where I was before Your Honor, virtually asking for documents about the change order claim.

So, I don't think there is merit to the assertion that the trustee is not pursuing this. I think we did get some answers last week in terms of, you know, what they are relying on, what the purported expert is, what the proof of claim is.  So, the trustee, you know, consistent with his business judgment, his statutory duties and rights, he can continue to administer property of the estate.

I respectfully submit we haven't heard evidence that the claim has no value.  I think the fact that we are here on a third motion seeking abandonment suggests that it has value.  I think the fact that its being attributed a multi-million-dollar value we can conclude it does not have value.

In terms of the --

THE COURT:  I'm sorry, you conclude -- look, over the course of this case I have heard lots of assertions that there is value in these claims against the government --

MR. HALL:  Right.

THE COURT:  -- and -- look, I'm not a government contracting expert so, you know, I can do my best with the record I've got. I think I said in an earlier opinion that

A129

just from looking at it from 40,000 feet it wasn't obvious to me there was value here but, again, I am a stay in your lane kind of guy and maybe there is something I don't know.

I just want to make sure I'm understanding your position. With respect to the change order claim --

MR. HALL: Correct.

THE COURT: -- as opposed to the one that has been fully litigated --

MR. HALL: Correct.

THE COURT: -- your position is you don't know yourself whether there is value, you are still looking, you've been asking for documents. You're representing you received new documents last week.

MR. HALL: We received information from Mr. Mott identifying previous -- documents that were identified generically, not specifically.

THE COURT: I see. So your view is you're still looking.

MR. HALL: Apologies, Your Honor.

THE COURT: Yeah.

MR. HALL: Mr. Cole reminds me, thank you, Your Honor, that -- I mean there is references to a process that they believe exists to pursue this claim and we've asked to talk to them about it, to understand what this is.

The trustee -- when it came to the -- just to

analogize, Your Honor, when it came to the cancellation claim there was no hesitation on the part of the trustee to pursue that claim as far as anyone would do it on the contingent basis, right. So, essentially, risk free costs for the estate.

So, this is not a trustee who is sitting on his rights and this is not a case where a trustee is -- where abandonment under 544(b) might be appropriate because the trustee is merely administering a fully encumbered asset that has value but it just (indiscernible). That is not the point. The trustee will administer an asset if we're given the information about the documents, whatever witnesses, whatever experts, and the process to pursue it. That is really what we're asking, Your Honor.

THE COURT: Okay.

MR. HALL: We're not -- you know, I'm not here to take definitive positions on what is or isn't. I think the position I'm taking, Your Honor, is they haven't proven a basis to abandon under 544(b).

THE COURT: Mr. Mott.

MR. MOTT: You know, ironically, Mr. Hall is the same lawyer who signed all those pleadings that says these claims are worse, remote, and hopeless. He doesn't say there might be something there if we look harder. Never said that in pleadings. He only said that to this Court.

As we have indicated, you got everything you need. If you have the communications for FEMA and you have the cost dated from Bering Straits. They have had that for two years. So, the notion that, you know -- now, somebody, I think when I was in the hospital with a spinal injury, said there's some process in a pleading. It wasn't me at that particular point. I am the only lawyer on this team that's done government contract work. I actually had one case for 218 change orders on a nuclear submarine simulation system for Great Lakes Naval Station. So, I know a little bit about change orders.

It really is what it is, the notion that there will be some investigation. It's in the exchange with FEMA. Was there an agreement. Their implying, from the emails they admitted into evidence, that there was discussions of containers before this alleged change order and the change order, therefore, was not any change at all. So, they're trying to have it like four different ways here. These things either have great value or they have no value or if we had some more information they might have value.

I think it's -- you know, we've been in this case for a long time and we're getting to very high docket numbers normally reserved for billion-dollar cases, I think. So, at this point for them to simply say on the change order they need more time, well, the documents we pointed out were ones they already had. They already had government contracts

experts and approval of the Court to hire a law firm expert in government contracts, hire these other consultant experts in government contracts.  That has been three years ago or more.

So, the notion that, you know, you can't do abandonment now, I mean the question is at what point does a cause of action become subject to abandonment.  And it seems like these are pretty classic cases where the trustee has -- we're not saying that the trustee didn't make an effort to collect them, we're saying apparently there were efforts made.  We have exhibits to show that.  They got experts to look at them, they had exchanges, they squeezed us to get every document that we could find that the client had about these.  It is what it is right now.

Does it seem to be a basis in their mind to collect it? I have no magical solution on this but it seems to me that if the trustee is left this way we will be in the same position two years from now which is there will be no action on these claims which the trustee has already said, four times in pleadings, are prospects of any recovery remote.  Didn't say if we had more documents and time to study it we might collect it.

Now, as to the matter having no value, so therefore it's not an asset, I think that has got to be dubious.  I mean, if there is some way to pursue that, if

there was some way to -- I'm just speculating about Congress. If FEMA wants us to do more work and we say, okay, if you give us part of the money that you owed us we will do more work or whatever.  There can be remote -- admittedly, remote and hypothetical situations where it would have value and it is sitting right now with the trustee, it is doing nothing for the estate at all.

So, I think in both of these cases its classically within the criteria of the statute and we offered to give the estate a cut of the -- of whatever mystical solution we might have to this at one point and they were not interested.

THE COURT:  And you didn't reach a deal.

MR. MOTT:  No.

THE COURT:  So, I think I understand the parties position on this.  What I am inclined to do is hear evidence and argument on the other matters that we have got for today and then at the end of the day, after we get through the agenda, I will decide what I am prepared to rule on today and where I -- what I might take under advisement.

So, I guess, Mr. Hall, to you if you want to take us through the next matters on the agenda unless there is more that anyone wants to say on that motion.

MR. HALL:  Your Honor, if I could actually just, before we close the record, address a couple points.

THE COURT:  You may.

A134

MR. HALL: Just because Mr. Mott mentioned about that there is nothing for the estate, well, there is a hundred percent certainty that there is nothing for the estate if you abandon it. There is, at least, a possibility of something for the estate if you deny their motion. And we wanted to make the argument that they did not show a proprietary interest in this claim and that we have cases where it's been denied, abandonment to a shareholder who cannot bring a claim in their own name.

I think it would be different, Your Honor, if it was a claim under the Uniform Fraudulent Transfer Act. The trustee is not pursuing it. A creditor says abandon it because I can pursue it.

THE COURT: That is something they owned before bankruptcy.

MR. HALL: Correct. They could -- correct, I think that is an important distinction, Your Honor.

THE COURT: So, I take it, if I understand your position, its whatever value is here belongs to the estate. If you need their help to get it then either you guys get to it -- you all are incentivized to reach a deal and either you reach a deal and preserve the value and decide how it gets wacked up or you don't but that unless and until there is a deal it belongs to the estate. I take it that is your bottom line more or less.

MR. HALL:  Yes, Your Honor.

THE COURT:  Okay.  I understand your position.

MR. HALL:  So, Your Honor -- I'm sorry, anything else on abandonment?

MR. MOTT:  No.

THE COURT:  Okay.  What is next on the agenda?

MR. HALL:  So, I think what we would propose is to simply defer Item 3, which is a Rule 11 motion for now and proceed with Items 4 and 5.  Item 4 is the TSI members/defendants motion to compel production pursuant to a subpoena.

THE COURT:  Okay, very well.

Mr. Mott.

MR. MOTT:  Thank you.  We think this issue is pretty clear.  The issue is we ask for all documents, specifically on TSI analysis, worksheets, information that had been compiled by Miller Coffey Tate while they ran up a $340,000 bill examining records of the debtor estate.  They also --

THE COURT:  So, Coffey Tate -- help me understand the context here, Coffey Tate is the financial advisor to the trustee.  So, they're doing work figuring out where is their value, where can we recover, what are creditors' claims, etc., right?

MR. MOTT:  No.  Most of their work was examining

A137

[Transcript Pages 76-127 Omitted]

128

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    January 26, 2026

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski                    January 26, 2026

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    January 26, 2026

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable

A138